**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Martin PRIEST, Defendant-Appellant.**

**No. WD 32863.**

Missouri Court of Appeals,
Western District.

Sept. 20, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 15, 1983.

Application to Transfer Denied Dec. 20, 1983.

Willard B. Bunch, Kansas City, for defendant-appellant.

Nicholas L. Swischer, Prosecuting Atty. of Vernon County, Mo., Nevada, Kris Green, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before WASSERSTROM, P.J., and NUGENT and LOWENSTEIN, JJ.

NUGENT, Judge.

Martin Priest was charged with capital murder, § 565.001[1], and convicted of murder in the second degree § 565.004, following a jury trial. He was sentenced to twenty-five years imprisonment. He appeals that conviction. We reverse defendant's conviction.

On appeal, Priest claims the trial court erred in failing to sustain his motion for acquittal when the evidence was not sufficient to establish either that the death was the result of some criminal agency (the corpus delicti) or that death resulted from a "willful" act on his part. Because we find this sufficiency issue dispositive, we do not address the other two issues raised by defendant.

## I.  *The Facts*

On June 15, 1980, the badly decomposed body of 12 year-old Tonya Lewis was found floating in the water near the bank of a farm pond south of Nevada, Missouri. Tonya had last been seen on June 13, 1980, in Nevada, where she lived in a housing project with her mother.

Defendant Martin Priest was employed on a painting crew at the housing project, and on June 12 painted the Lewis apartment and bought a 1972 Dodge from Shirley Lewis, Tonya's mother.

On June 13 Priest was again painting the Lewis apartment when Tonya and her friend Kelly Schumacher discussed going to the municipal swimming pool. They did so that afternoon, and Priest and his stepdaughter arrived shortly thereafter. Priest had told his employer he was going to a job interview. Tonya and Priest played together in the pool, and he bought a coke for her and his stepdaughter. Before leaving, they agreed to play basketball later that day, and did so from 5:00 to 7:30 p.m. Friends of Priest who saw him playing basketball with Tonya suggested a game of "Indian Ball". Tonya called her mother to tell her she was going to a movie with Kelly and then followed Priest and his friends to the ball field. During the game, Marvin Buller, who was chasing a fly ball, collided with and knocked Tonya down. She appeared to be unhurt but left the game alone sometime before it ended.

Just before 9:00 o'clock, Priest said he had to pick up his wife at work, and the game ended. In fact, he did not pick up his wife.

Apparently, after she left the ballgame, Tonya was not seen alive again. Priest was next seen after 10:30 when Shirley Lewis, concerned that Tonya was not home and remembering that she saw her playing basketball with Priest earlier, went to Priest's apartment and asked if he knew where Tonya was. He replied that the girl had gotten a splinter in her finger while playing basketball and had gone home. He said that he returned to his home at that time and stayed there all evening.

Physical evidence from the scene indicated that a car had driven through the prairie grass close to the farm pond. Investigators found oil and grease where the car was parked. Tire tracks showed that the rear tires were bald and the front tires had little tread. Beaten down grass and weeds

1. All sectional references are to Revised Statutes of Missouri, 1978.

indicated that the driver had walked from his side of the car to the passenger side. A human hair was found on the barbed wire fence. From there, a path of broken grass led to the pond through a thicket of briars. Although the briars bore no hair, bits of torn clothing, flesh or blood, witnesses who found Tonya's body testified that her shirt was rolled up around her chest and had briars in it, and that scratches were visible on her back. The grass around a barbed wire fence was heavily trodden.

Neither Tonya's sister, who identified the body, the coroner, nor forensic chemist Afton Ware, all of whom saw the clothing, mentioned any briars. Ware specifically examined the clothing, and testified that he did not find "anything of significance" other than that the clothing had been cut to remove it from the body.

When questioned later, Priest told police he had gone fishing that evening at another pond called Katy Island Pond. On the night Tonya disappeared, that pond was eighteen inches deep and covered with moss. His fishing poles were examined and found to be dusty. Police observed scratches on the back of his legs from his knees to his ankles and when questioned about them, he became angry.

When authorities sought to photograph his legs, Priest sent a letter [2] to the sheriff, apparently written by his acting counsel, stating that he did not wish to be interrogated further, that he would not consent to photographs and that he wanted an attorney appointed to represent him. When photographs were taken several days later, Priest had apparently rubbed the scabs off the leg scratches. A comparison of a sample of defendant's hair with a hair found on the barbed wire fence at the pond where Tonya's body was found led forensic chemist Ware to conclude that the questioned hair was not defendant's. Because of a difference in color, that hair could not be matched to Tonya's hair. Microscopic examination of Priest's shoes showed nothing

of significance—no mud, no blood stains and no hairs.

An examination of Priest's car revealed that it leaked oil and grease. No blood or blood stains were found in the car. Hairs found in the car had microscopic characteristics similar to hairs taken from the body. Prairie grass found on the undercarriage and inside the car was similar to grass at the pond area. Red spots taken from the car as possible blood stains proved to be paint. Dirt samples found on the bumper and in the trunk area of defendant's car did not match mud samples from the vicinity of the pond.

The pond, which was not visible from the road, was located on a farm eleven miles south of Nevada which Priest's mother had once considered renting. Although the body was found in shallow water near the bank, other parts of the pond were deep enough for swimming.

The pathologist, Dr. Albert Upsher, testified that he found no fractures of any limbs or the skull, although the badly decomposed condition of the body made it impossible to determine whether she had sustained any blows that did not fracture the bone. He found no evidence of disease; no evidence of sexual assault; no sperm or enzymes related to the male; no rupture of small blood vessels in the lungs, as normally occurs in strangulation or smothering; no poisons, stimulants or depressants; and no sign of the scratches on the back which witnesses at the scene said they had observed. He hypothesized the possibility that the scratches could have resulted from the sloughing off of skin on the back which may have occurred when the body was transferred to the ambulance, or that the "scratches" may have actually been "nothing more than dirt that had been removed by the mortician in trying to clean up the body." He further testified that, although he could not determine whether Tonya was alive or dead when she entered the pond, his opinion was that she drowned. His ex-

---

**2.** This letter was admitted in evidence. Priest's second point on appeal, which we do not ad-

dress, challenges its admissibility.

amination showed nothing inconsistent with accidental drowning.

The prosecution adduced no evidence as to the approximate time of Tonya's death and did not ask Dr. Upsher for an estimate of the time. The accounting for defendant's time on the evening of June 13 by the state's witnesses left only one hour forty minutes unaccounted for between the 9:00 p.m. break up of the game and the time state witness Lear precisely testified that Martin Priest was home: 10:40 p.m.

The forensic chemist microscopically examined fingernail scrapings from Tonya's nails. On one fingernail he noted a very minute and unidentifiable bit of black substance appearing to be oil or grease, but the other fingernails showed nothing unusual.

In his closing argument at trial, in response to defense counsel's argument that the state had failed to show a motive, the prosecutor referred to the killings of some twenty-seven young children in Atlanta, a matter then prominent in the news.[3]

The jury was instructed on capital murder, second-degree murder, and conventional manslaughter, and returned a verdict of guilty on second-degree murder.

## II. *Corpus delicti*

■ We turn now to the applicable law. The corpus delicti in a homicide case consists of two elements: (1) the death of a human being, and (2) the criminal agency of another. The criminal act of the defendant is an additional element not part of the corpus delicti, although evidence which tends to prove the second element of corpus delicti may also tend to prove the defendant's criminality.

■ To establish the corpus delicti, the state must prove that the death was neither self-inflicted nor the result of natural causes or accident. *State v. Morris*, 564 S.W.2d 303, 309 (Mo.App.1978). Although the cause of death must be proven beyond a reasonable doubt, it may be shown by cir-

cumstantial evidence. *Holtkamp v. State*, 588 S.W.2d 183, 188 (Mo.App.1979).

■ Even when circumstantial, all evidence upon the whole record tending to support the guilty verdict must be taken as true, contrary evidence must be disregarded, and every reasonable inference tending to support the verdict must be indulged. *State v. Morris, supra*, at 304.

■ Of course, the burden of proving the corpus delicti is on the state. *State v. Gillman*, 329 Mo. 306, 44 S.W.2d 146 (1931).

Defendant does not dispute that a death has occurred. On the corpus delicti issue we need examine the record only to determine whether the state has proven beyond a reasonable doubt that the death resulted from the criminality of another by proving that it was neither self-inflicted nor the result of natural causes or accident. Because nothing in the evidence suggests suicide and Dr. Upsher has ruled out natural causes (disease), our examination centers on accident.

Drawing all reasonable inferences tending to support the verdict, as we must, the evidence shows the following: (1) Tonya and Priest both misrepresented to others their plans for the evening from which the inference may be drawn that they intended instead to meet each other; (2) someone drove Tonya to the pond; (3) some person or persons walked with (or dragged or carried) Tonya to the pond; (4) Tonya drowned in the pond; (5) defendant later lied when he claimed to have gone fishing that evening; (6) defendant was uncooperative when authorities attempted to photograph scratches on his legs which could be used as some evidence of his having walked through briars such as those present near the bank of the pond.

From these facts, we can reasonably hypothesize that the "someone" was defendant Priest, that at the pond he drowned Tonya, signs of a struggle having been lost as a result of the decomposition of the body,

---

**3.** Priest's third point on appeal characterizes these comments as "inflammatory and prejudi- cial arguments" warranting a mistrial.

and that he later lied to conceal his guilt. Just as compatible, however, with all the evidence (both facts and inferences) is the hypothesis that, while at the pond with Priest, Tonya accidentally drowned while swimming in a deeper part of the pond, her body later floating into the shallow area. Realizing the compromising position he was in by being out at night with a young girl who died while in his company, Priest panicked, fled without seeking help and, for fear of being charged with her death, lied when later questioned.

The fact that this other possible hypothesis exists, however, does not end our discussion. The general rule is that "the facts and circumstances ... must not only be consistent with each other and with the hypothesis of accused's guilt, but must also be inconsistent with his innocence and point so clearly and satisfactorily to guilt to exclude every reasonable hypothesis of innocence." *State v. Odum,* 351 S.W.2d 10, 14 (Mo.1961), quoting *State v. Paglino,* 319 S.W.2d 613 (Mo.1958). This principle is tempered, however, by the rule so that "the mere existence of other possible hypothesis [sic] is not enough to remove the case from the jury." *State v. Franco,* 544 S.W.2d 533, 534–35 (Mo.1976) (en banc), quoting from *State v. Thomas,* 452 S.W.2d 160, 162 (Mo. 1970).

On first reading, these rules seem inconsistent. Closer analysis shows, however, that the characterization of the alternative hypothesis is key. The state's evidence must exclude every *reasonable* hypothesis, but need not rule out *all possible* hypotheses. In other words, if a hypothesis is merely *possible,* that is, one of all the conceivable hypotheses that a creative defense counsel can imagine, however remote, granting of a motion for acquittal is not warranted.

Here, we cannot comfortably say that the hypothesis of accidental drowning rises above the level of possibility. In view of all the evidence, including the fact that the girl was wearing bathing suit bottoms under her clothes and yet her body was found fully clothed, and that her body was found precisely at the point where the path reached the pond, the reasonableness of the theory that she drowned while swimming and coincidentally floating to that spot grows dim. Although we find the establishment of corpus delicti to be marginal on these facts, we cannot hold that reasonable minds could not exclude the possibility of accident.

### III. Submissibility of second-degree murder

Defendant questions as well the sufficiency of the proof of his criminal agency in causing Tonya's death, specifically the "willful act" required for second-degree murder.

As provided in MAI–CR2d 15.14 and as the jury here was instructed in Instruction 6, a verdict of guilty on second-degree murder required findings that the defendant caused the death of Tonya Lewis by drowning, that he intended to take her life, and that he did not do so in fear suddenly provoked by her unexpected acts or conduct. Accepting as true every piece of the evidence presented by the state and every inference that can be drawn from it, the fact remains that no evidence whatsoever was presented on the element of intent.

In *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court reemphasized its holding in *In Re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that to warrant submission, the evidence must be sufficient to permit any rational trier of fact to find all the essential elements of the crime beyond a reasonable doubt. The Court in *Jackson* also held 443 U.S. at 316–17, 99 S.Ct. at 2788 that this doctrine "requires more than simply a trial ritual" of informing the jury of the beyond a reasonable doubt standard. Even "a properly instructed jury may occasionally convict even when it can be said no rational trier of fact could find guilt beyond a reasonable doubt ...." When this occurs in a state trial, the Court specifically held at 317–18, 99 S.Ct. at

2788 that, just as in federal trials, the conviction "cannot constitutionally stand."

■ Here, where *no* evidence was presented on the essential element of intent, we find no basis whatsoever on which a rational fact-finder could find beyond a reasonable doubt that the defendant intended to kill Tonya Lewis.

■ In so holding, we are mindful of the rule that although "[i]t is the burden of the prosecution to establish beyond a reasonable doubt that defendant intended to kill or inflict serious bodily harm . . . [i]ntent may be inferred from the circumstances of the case." *State v. Black,* 611 S.W.2d 236, 239 (Mo.App.1980). The inference of intent required for conviction of second-degree murder, however, may be found only when "the prohibited result may reasonably be expected to follow from a *voluntary* act, irrespective of any subjective desire on the part of the offender . . . ." (Emphasis added.) *State v. Powell,* 630 S.W.2d 168 (Mo.App. 1982).

The prerequisite of a *voluntary* act before intent may be inferred was made most clear in *State v. Black, supra,* in which the defendant, charged with shooting her husband, claimed that the gun had discharged when she handed it to him. She had no idea why. The court at 239 traced back the rule that intent to kill may be inferred when a deadly weapon is used upon a vital part of the body, and concluded that the presumption does not apply unless the weapon is used *intentionally.* This conclusion was largely based on the following language quoted from *State v. McCracken,* 341 Mo. 697, 108 S.W.2d 372, 374 (1937) (en banc):

> Where a homicide is intentionally committed with a deadly weapon used upon a vital part of the body and there is no witness to the occurrence, murder in the

second degree is presumed in the absence of evidence to show a different grade of offense or that such killing was justifiable or excusable. (*Black* court's emphasis.)

The *Black* court then went on to explain that in cases where the rule of presumed intent had been applied, something more than the discharge of a firearm has been present, such as acts of self-defense (by definition, intentional), arguments or fights. *See also State v. Martin,* 364 Mo. 258, 260 S.W.2d 536, 538 (Mo.1953) (en banc), stating that the presumption of intent to kill from the use of a deadly weapon does not arise absent an intentional act.[4]

Here, we not only do not know whether the act which killed Tonya Lewis was intentionally committed, we do not know what the act was. Indeed, we do not find evidence of any act at all. We can speculate that the defendant may have intentionally struck her so as to render her unconscious or kill her (testimony that her death was caused by drowning would indicate the former), and dragged her body, either dead or apparently so, to the pond. Just as reasonable, however, is the possibility of an unintentional blow. Tonya may even have accidentally struck her own head against a solid object, or she may have accidentally drowned. On the evidence presented, we cannot know. None of the surrounding circumstances provides the "something more" needed to justify a presumption of intent. We have no evidence of animosity between the defendant and Tonya, no fights, no threats. Further, we have no presence of semen, no clothes in disarray, no partial nudity which might provide defendant with a reason for an intentional act of violence, as to force cooperation or retaliate for non-cooperation.

We have nothing here other than the apparent meeting of the defendant and Tonya Lewis and his later attempts to dis-

---

4. For a concise statement of the law in this area, *see* Suni, *Recent Developments in Missouri: Criminal Law: Homicide,* 50 UMKC L.Rev. 440, 489 (1982):

> While intent to kill or cause serious bodily harm is necessary [to establish second degree murder], this intent need not be proved by direct evidence. Intent may be presumed where there has been a killing by the use of a deadly weapon upon a vital part of the body of the victim. This presumption arises, however, only after proof of the intentional use of a deadly weapon.

pose of her body. What happened in between is left blank by the evidence, offering us no clues as to whether her death resulted from intentional acts by the defendant or from unintentional acts by him or Tonya herself or from some unguessed cause. That being so, we find no basis on which a rational trier of fact could find beyond a reasonable doubt that Martin Priest intentionally caused the death of Tonya Lewis. His conviction for second-degree murder cannot stand.

### IV. *Manslaughter*

Although, as already held, the conviction for second-degree murder cannot be sustained, the question whether manslaughter was properly submitted as an alternative remains for consideration.

Section 565.005, Manslaughter, provides as follows: "Every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter."

Manslaughter, unlike second-degree murder, does not require proof of an intentional act. Nevertheless, the prosecution must prove a voluntary act as provided by § 562.011 and a culpable state of mind as required by § 562.016. Those two sections are applicable to manslaughter, even though it is a non-Code offense. § 556.-031–2, R.S.Mo.1978; Manual for Court Related Personnel, Section 1.7. A culpable state of mind under the latter section may consist of purpose, knowledge, recklessness or criminal negligence. The first two of those concepts would seem to constitute elements of "conventional manslaughter", submissible by MAI–CR2d 15.18, while the last two are covered by "culpably negligent homicide," submissible by MAI–CR2d 15.20.

For reasons stated in part III of this opinion, the state did not prove that defendant acted purposely or knowingly within the meaning of § 562.016. Accordingly, the evidence was insufficient to sustain a conviction for conventional manslaughter.

Prosecution of defendant by amended information alleging culpably negligent manslaughter is barred by the fact that culpably negligent manslaughter is a different offense from and not a lesser included offense of anything originally charged. See Note 5 of Notes on Use to MAI–CR2d 15.20. Therefore, such an amendment would not be permissible under Rule 23.08.

Prosecution of defendant for culpably negligent manslaughter by a new indictment or information is now foreclosed by the statute of limitations, § 556.036.2(1), because that offense is a separate offense, not a lesser included offense of murder. See Note 5, *supra*. Section 556.036.6(1) tolls the running of the statute while "a prosecution for the offense is pending". Here, however, it did not toll the running of the statute because prosecution for the separate and distinct offense of culpably negligent manslaughter was not pending within the meaning of that section. Defendant was charged with capital murder, and its lesser included offenses do not include culpably negligent manslaughter.

The judgment of conviction is reversed and the defendant is ordered discharged.

All concur.