**STATE of Missouri, Respondent,**

v.

**Paul ELLISON, Appellant.**

No. WD 54491.

Missouri Court of Appeals,
Western District.

Submitted June 10, 1998.

Decided Oct. 6, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 24, 1998.

Application for Transfer Denied
Dec. 22, 1998.

David Simpson, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Barbara K. Chesser, Asst. Atty. Gen., Jefferson City, for respondent.

Before ULRICH, C.J., P.J., and SMART and EDWIN H. SMITH, JJ.

SMART, Judge.

A jury found Paul Ellison guilty of murder in the second degree, § 565.021, RSMo 1994 [1] in the death of his ex-wife. He was sentenced to life imprisonment. Ellison contends that the trial court erred in denying his motion for acquittal because the evidence was insufficient to prove that he acted intentionally in killing his ex-wife. Because we conclude that there was sufficient evidence from which a reasonable jury could have found him guilty beyond a reasonable doubt, we affirm the judgment.

We review the facts in the light most favorable to the verdict. *State v. Lyons,* 951 S.W.2d 584, 587 (Mo. banc 1997). We accept as true all evidence favorable to the State, including all favorable inferences drawn from that evidence. *State v. Butler,* 951 S.W.2d 600, 604 (Mo. banc 1997). All evidence and inferences to the contrary are discarded. *Id.* This court is not to act as a "super juror" possessing a veto power over the decision made by the trier of fact. *State v. Chaney,* 967 S.W.2d 47, 52 (Mo. banc 1998). Great deference is to be shown to the trier of fact. *Id.* Our inquiry is focused on whether, after viewing the evidence in the light most favorable to the State, a rational finder of fact could have found, beyond a reasonable doubt, the essential elements of the crime. *Id.*

### The Facts

Paul Ellison and Sheila Ellison were married in the mid–1980s. The couple divorced sometime in 1990 or 1991. After the divorce, Sheila lived with John Kincaid for almost a year. She and Ellison reconciled several times. In early to mid–1993, Sheila moved back in with Ellison.

On February 5, 1994, Sheila and Ellison went to visit Sheila's sister, Sheryl Schnittker. Sheryl noticed that Sheila "didn't seem too happy" with Ellison. Based upon conversations with Sheila and the way Sheila was acting, Sheryl was worried. She took Sheila aside and asked Sheila to call her. The Ellisons left. Later that evening, around 9:00 p.m. or 9:30 p.m., Ellison called Sheryl. He was hysterical, crying and sobbing. Elli-

son told Sheryl that Sheila had left him. Ellison said that the two of them discussed having pizza for dinner. He said that as they got ready to phone in their order, Sheila received a telephone call from John Kincaid. Ellison said that Sheila talked to Kincaid for a long time. He claimed that, after the telephone call, Sheila told him that she loved Kincaid, slipped a leash on her dog, and left. Sheryl testified that she assumed that Sheila would call her in a couple of days to let her know what was going on. Time passed, and Sheryl heard nothing from Sheila. Sheryl did not try to call Sheila because Sheryl did not get along with John Kincaid.

Sheila also did not return to work the following Monday, two days after Ellison had reported that she left. Ellison also took the day off from work the following Monday for "personal business." A few days later, Ellison stopped by Sheryl's house. He was upset and teary-eyed. He told Sheryl to tell Sheila that he loved her if she saw her. Ellison went to Sheryl's house again a few weeks later. His wrists were bound in clean gauze. He told Sheryl that he attempted to slit his wrists because he missed Sheila. He also mentioned that he would like to have Sheila's dog if Sheila couldn't keep it. On another occasion, Ellison stopped by Sheryl's house to tell her that he had taken Sheila's furniture to John Kincaid's parent's house in Richmond, Missouri. Sheryl was confused because she knew that Kincaid's parents did not live in Richmond anymore. Sheryl also became suspicious when she ran into John Kincaid's mother at Wal–Mart and found out that Sheila and Kincaid were not together. Sheryl met with her sister, Mary, and their mother. They reported Sheila missing.

On another occasion, Sheryl came home to find two post-it notes on her door. One purported to be from Sheila, one from Paul Ellison. Ellison's note said "this is what I found on my door when I got home from work." The other note, supposedly from Sheila, stated, "I want $200 for my stuff I have left here in the house."

On April 8, 1994, Ellison wrecked Sheila's car. Sheila had made regular monthly pay-

1. All statutory references are to Missouri Revised Statutes 1994, unless otherwise indicated.

ments on the car until March of 1994. After receiving notice of a missed payment, Paul went to the dealership and paid the remaining balance on the car. He told the dealer that he did not know where Sheila was. He told the dealer that she had left with someone. Sheryl received two letters from Ellison after the wreck. The first letter, postmarked May 2, 1994, informed Sheryl that he had been staying with "Bee" who helped him out after his accident. In the second letter, postmarked May 5, 1994, Ellison wrote that he had seen Sheila twice, one night during the latter part of March, and once on April 6, 1994, when he bought her car. He stated that he gave Sheila $960.00 for the car and that she was with someone driving a Firebird or Camaro.

Billie Atha, Sheila's mother, became suspicious when she read about Ellison's wreck and found that Ellison had been driving Sheila's car. She contacted Trooper Ron Meade and told him that something was wrong because Sheila never let Ellison drive the car on his own. Ms. Atha went to see Ellison. He opened the door part way, told her that Sheila had left and had taken the furniture to Richmond. She noticed that the cellar doors were chained and padlocked with a concrete block on them.

Patricia "Blondie" Ray, a friend of Ellison's, received a letter signed "Sheila Kincaid." The letter read, "I got everything I wanted from him. All I did was use him. I really didn't love him any more." Blondie had met Sheila on only two or three occasions. Sheila had never sent Blondie any letters before, nor had she ever called her on the telephone. The handwriting on the letter looked to Blondie like Ellison's handwriting. When Blondie confronted Paul with the letter, he told Blondie that Sheila was missing and then he threw the letter away.

Corporal Ron Meade, an officer with the Missouri State Highway Patrol, was called in on April 8, 1994, to investigate Ellison's car accident. He attempted to contact Sheila because she was the registered owner of the car. The accident case was closed, and Ellison was issued a citation. Sheila's mother then contacted the Highway Patrol concerning her daughter's disappearance. Corporal Meade spoke with her and advised her to make a missing persons report. Corporal Meade then contacted Ellison by telephone and asked him about Sheila. Ellison told Corporal Meade that Sheila had left him on February 5, 1994, and that he had not seen her or heard from her. Investigating further, Corporal Meade found that Sheila had not been at work since February 4, 1994. Her last paycheck had been sent to her and had been cashed. Corporal Meade went to see Ellison. He asked Ellison about the title to Sheila's car. Ellison told the trooper that Sheila had come by and signed the title over to him on April 6, 1994. At a later interview, in September 1994, Ellison admitted that he had forged his name on Sheila's car title and her final paycheck. When asked about the letters he had written, he also admitted that there was no "Bee." In March 1995, the police interviewed Ellison at his home. The officers told Ellison that they "knew he had done something to Sheila." Ellison started to cry. He sat in a fetal position with his head down and would not look at the officers.

On November 2, 1995, eighteen months after Sheila's disappearance, the police obtained a warrant to search Ellison's house. Ellison was present when the police arrived but left before the search was over. The officers found a diamond wedding ring and a letter written from Ellison to Sheila dated October 7, 1994. Ellison's cellar door was chained and locked. There was a concrete block on the door and a "No Trespassing" sign had been posted. A sewage pipe was draining directly onto the floor of the cellar and there was a large puddle of water on the floor. The cellar smelled of raw sewage. A pump was used to remove most of the liquid. The skeleton of a small dog was discovered where the water had pooled, embedded in the mud. The size of the skeleton was consistent with the size of Sheila's dog. There were other skeletal remains of what appeared to be dogs and cats. The cellar was divided into two rooms. The northwest corner of the cellar floor was covered with old tires and junk. The dirt there was mounded, unlike the remainder of the dirt in the cellar. The mound was the shape and size of a human grave site.

Not far from the surface, the officers uncovered a metal wardrobe cabinet wrapped in black plastic. Tearing away the plastic, the officers found that the doors to the wardrobe had been tied shut with a maroon nylon strap resembling a leash. After the strap was removed, a concrete slab was discovered. The officers worked a shovel down between the slab and the sides of the cabinet. The odor of a decomposed body was released. The police called for assistance to the anthropology department at the University of Missouri, who came to help with the excavation of the body. The body of Sheila Ellison was recovered from the concrete. She was wrapped in an afghan and had been buried with several items including a Bible, an embroidered plaque commemorating her wedding to Ellison, and a candle holder.

Ellison left during the search. He told the officers he would return at about 3:00 p.m. He did not return. Corporal David Sater proceeded to an address that had been discovered during the search. There Corporal Sater found Ellison. Ellison refused to make a statement or to identify himself. Corporal Sater identified Ellison from his driver's license. He arrested Ellison. During the pat down, Corporal Sater found an envelope containing $700.00 in Ellison's pocket.

Ellison was taken into custody and given the *Miranda* [2] warnings. He agreed to talk. Sergeant James Riply described his remarks:

[H]e said he loved Sheila, that he always loved her, that her family never cared about her, that she took advantage of him, that she wanted him to buy everything, that he bought her that dog, that Sheila said that she loved him like [he] loved her. When she left [him] the last time [he] lost [his] temper. He said that it was an accident. He didn't mean to hurt her and he didn't know what to do. He said he had slept next to her for several months without having sex and he would go from being critical of Sheila, saying that she didn't care about him, he loved her, she took advantage of him, to saying he loved her. He took his billfold out of his pocket, showed me several pictures of Sheila, rubbed his hand across them and he said

he loved her. He said he always loved her. He said she was beautiful.

Ellison also told Sergeant Riply that Sheila started talking to him after she was dead. She would tell him when to do things, such as pay his bills.

The parties stipulated that the body found in Ellison's cellar was the body of Sheila Ellison. Dr. Jay Dix, a forensic pathologist serving as the Boone County and Callaway County medical examiner, performed an autopsy on Sheila's body. The tissue had deteriorated and the body was partially skeletonized. Dr. Dix testified that her body had undergone a type of decomposition called "adipose sere." This condition occurs when the body is left in a wet and cold environment over a period of time. The head was detached from the body. The body had deteriorated to an extent that Dr. Dix could not determine the cause of death. There were no obvious injuries, no signs of trauma, and x-rays failed to reveal any bullets or other metal objects in the body. Dr. Dix could not exclude strangulation, asphyxiation or suffocation as the cause of death. By the same token, he also could not exclude a death by natural causes or by accident. He made the determination that Sheila's death was a homicide based upon the circumstances under which her body was found. Sheila's family physician testified that Sheila had no life threatening medical conditions and that she had never shown risk factors for any serious medical problems.

Ellison was charged with murder in the second degree. He presented no evidence at trial. At the end of the State's case, the defense moved for acquittal, contending that the State had not proved one of the elements of the crime of second degree murder, namely that Ellison knowingly or intentionally caused the death of Sheila Ellison. The trial court denied the motion. Instructions on second degree murder and involuntary manslaughter were submitted to the jury. The jury convicted Ellison of murder in the second degree and recommended life in prison. The court followed the recommendation. Ellison appeals.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In his first point, Ellison contends that the trial court erred in denying his motion for acquittal notwithstanding the verdict in violation of this right to due process of law under the Fourteenth Amendment of the United States Constitution and Article 1, § 10 of the Missouri Constitution because the evidence was insufficient to prove that he intentionally killed Sheila in that there was no evidence showing how Sheila died. He argues that the inferences supported by the circumstantial evidence of his conduct after Sheila died, viewed in the light most favorable to the verdict, do not prove that he acted intentionally rather than recklessly or negligently. In Point II, Ellison also claims that the evidence supports two equally valid inferences: 1) that he intentionally caused Sheila's death, and 2) that he accidentally caused Sheila's death.

**Sufficiency of the Evidence**

■ The *corpus delicti* in a homicide case consists of two elements—(1) proof of the death of the victim and (2) evidence that the criminal agency of another was the cause of the victim's death. *State v. Fears*, 803 S.W.2d 605, 608 (Mo. banc 1991). A person commits the crime of murder in the second degree if he "knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person." § 565.021.1(1), RSMo 1994. Direct proof of a defendant's mental state is not determinative because such proof is rarely available. *State v. Harris*, 854 S.W.2d 853, 856 (Mo.App. 1993). Mental elements establishing the intent of a defendant may be proven by inferences drawn from the surrounding circumstances. *State v. Overkamp*, 646 S.W.2d 733, 737 (Mo. banc 1983). Voluntary manslaughter is the act of causing a person's death under circumstances which would constitute second degree murder, except for the fact that the perpetrator was influenced by sudden passion arising from adequate cause. § 565.023.1(1), RSMo 1994.

In reviewing a challenge to the sufficiency of the evidence to support a criminal conviction, this court is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found

the defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). We accept as true all of the evidence favorable to the State, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.*

■ The evidence establishes the *corpus delicti* of a crime. The parties agreed that the body found in Paul's cellar was the body of Sheila Ellison. In a statement made after his arrest, Ellison impliedly acknowledged responsibility for Sheila's death, although he claimed that it was "an accident," and that he didn't mean to hurt her. He declined, however, to supply further detail as to the alleged accidental nature of Sheila's death. The jury, of course, was clearly entitled to reject the proposition that the death was an accident. The jury was entitled to draw the inference that Ellison killed his ex-wife and buried her body in the cellar. There was also reason to believe that Sheila was planning to leave Ellison again and return to Kincaid, because Ellison told as much to Sheila's sister (although he did not tell her that he had killed Sheila).

■ It goes without saying that the performance of a conscious act generally supports the inference that the act was intentional. It is true that in criminal cases the law does not allow a state to create a *legal presumption* of malice aforethought (intent to seriously injure or kill) from the fact of a homicide. *Mullaney v. Wilbur*, 421 U.S. 684, 696, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). However, we may still *infer* malice from conduct and circumstances. *Id.*

Defendant Ellison was free to argue throughout the trial that the state had the burden of proving intent beyond a reasonable doubt. The court gave the jury instructions on both murder and involuntary manslaughter. The jury was allowed to consider the evidence in the light of both murder and involuntary manslaughter, without any legal presumption of murder. The jurors were entitled to infer malice aforethought from what they knew of the facts: Ellison's ex-wife was dead, having been killed, buried and hidden by her ex-husband; they also knew Ellison had a motive to kill her; they also

knew Ellison had converted her property to his own use, and had demonstrated a guilty mind in his extensive efforts to cover the fact that he had killed her.

It is not accurate to say that his evasive actions were equally consistent with a negligent or reckless death, as opposed to an intentional act of murder. A person guilty of murder can generally be expected to go to far greater lengths to destroy evidence than a person guilty of an accidental or reckless death. This is because it is instinctively and intuitively apprehended that one's best hope to be believed that a death was actually accidental or reckless is to immediately report the death and explain the circumstances. Ellison not only failed to report her death promptly, but falsely stated that she had left him, and secreted the body, thereby frustrating the normal investigative process, which would have revealed the precise cause of death.

### Ellison's Actions in Concealing the Body

### Support an Inference of Malice Aforethought

In *State v. Franco*, 544 S.W.2d 533, 535 (Mo. banc 1976), the defendant concealed the bodies of his two victims under a pile of canvas awnings in the basement of his girlfriend's home. The court held that, "[t]he jury in the instant case could reasonably infer from the concealment of the victims' bodies that they were intentionally killed under circumstances that could not be deemed justifiable or excusable, and that their deaths were not suicidal or accidental." *Id.* at 536. In *State v. Nyhuis*, 906 S.W.2d 405 (Mo.App. 1995), the defendant argued that the State did not prove that his wife's death was not the result of an accident. The court held that the facts were sufficient to establish that the defendant acted with deliberation in killing his wife. *Id.* at 410. The defendant in *Nyhuis* stored his wife's body in a freezer for over three months. He then removed the body and buried it in a remote area and covered it with lime to speed decomposition. *Id.* Conduct by a defendant in concealing a body or other evidence of a crime was held to support an inference of deliberation in *State v. Moore*, 949 S.W.2d 629 (Mo.App.1997) (de-

fendant failed to seek medical help for his victims; let one body lie in a bed for an entire day following the murder; and tried to place the blame for the murders on someone else by telling the police that another man had been in the house the day of the murders) and *State v. Branch*, 757 S.W.2d 595 (Mo.App.1988) (defendant shot husband at close range, dragged body downstairs, attempted to dispose of weapon, washed clothes and sheets to conceal blood and delayed calling for help).

In *State v. Dickson*, 78 Mo. 438 (1883), Dickson and McNab rented a farm together. In March 1880, McNab disappeared. *Id.* at 444. Dickson told people that McNab had gone to Arkansas. McNab's body was found two years later buried in a field under a log. *Id.* at 445. The court held that the *corpus delicti* had been established, stating:

> Now in the present case the admissions of Dickson, repeatedly made, that he buried the logs, carry with them the rational inference that he dug the hole in the ground for the log and that he placed the body of McNab first in the hole, and them placed the log on top of the body. What was his purpose in thus concealing the fact of the homicide? The only reasonable inference which can be drawn from such premises, is that he did so in the endeavor to conceal his own criminal agency in effecting McNab's death. At least it is "highly probable" that this was the motive that prompted him, and under the authority of *Burdette's case, supra*, this is sufficient; for it is one of the badges of guilt to attempt concealment of the act done; and the probable inference, therefore, is where a homicide has been committed and the body is concealed, to connect the individual who conceals it with the crime as author or participator.

*Id.* at 448. The court in *Dickson* also found it significant that Dickson made false statements about McNab's disappearance, finding that "[t]hese misrepresentations as to the cause of such disappearance could only spring from a consciousness of guilt...." *Id.*

Ellison relies upon *State v. Priest,* 660 S.W.2d 300 (Mo.App.1983) in support of his contention that the evidence was insufficient to show intent. In *Priest,* the badly decomposed body of a young girl was found in a farm pond. *Id.* at 302. The girl had been seen with the defendant shortly before her death, playing with him and his stepdaughter. On the night of the girl's disappearance, the defendant said he had been fishing. Scratches on his ankles were observed and the defendant became angry when asked about them. *Id.* at 303. Prairie grasses similar to those near the pond area were found on his car. *Id.* No cause of death was established. There was no evidence of sexual assault. *Id.* This court reversed the defendant's conviction, holding that reasonable minds could not exclude the possibility of an accident. *Id.* at 305. There was nothing to suggest that the child's death was intentional and no evidence of any animosity between the defendant and the victim. *Id.* at 306.

*Priest* is distinguishable. In this case, Ellison's own statement shows that he was the agent of Sheila's death. Ellison also had a motive due to his resentment of Sheila for her choice to reject him. Furthermore, he disposed of the body. In *Priest,* on the other hand, the body was found in a pond where an accidental drowning could not be ruled out as the cause of death. Here, there was no indication of accident apart from Ellison's vague reference, without explanation, that the death was an accident, an assertion which the jury was entitled to reject.

For all the foregoing reasons, we conclude that the jury could reasonably infer intent to kill or to cause serious physical injury from the circumstantial evidence and Ellison's conduct. Point I is denied.

■ Ellison next argues, in Point II, that the evidence supports two equally valid inferences, "that Ellison intentionally did something to his wife to cause her death ... [and] ... that [Ellison] either negligently or recklessly caused Sheila's death...." He claims that none of the State's evidence supports one of these theories more than the other. Paul's argument is based upon the now discredited equally valid inferences rule. The rule provided that if two equally valid infer-

ences can be drawn from the same evidence, guilt beyond a reasonable doubt cannot be established. *State v. Roberts,* 709 S.W.2d 857, 862 (Mo. banc 1986). Recently, the Missouri Supreme Court unequivocally held that the rule had been abrogated in *State v. Grim,* 854 S.W.2d 403 (Mo. banc 1993). *Chaney,* 967 S.W.2d at 54. The *Chaney* court explained that the equally valid inferences rule was in conflict with the standard for appellate review—the presumption that the trier of fact drew all reasonable inferences in favor of the verdict. *Id.* Ellison's argument, in any event, is really another version of the argument already rejected in our discussion of his first point. Point II is denied.

Judgment is affirmed.

ULRICH and EDWIN H. SMITH, JJ., concur.