**STATE of Missouri, Respondent,**

v.

**Myson D. DONAHUE, Appellant.**

No. WD 67745.

Missouri Court of Appeals,
Western District.

Feb. 10, 2009.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 31, 2009.

Application for Transfer Denied
May 5, 2009.

S. Kate Webber, Kansas City, MO, for appellant.

Shaun J. Mackelprang, Daniel N. McPherson, Jefferson City, MO, for respondent.

Before Court En Banc: THOMAS H. NEWTON, C.J., HAROLD L. LOWENSTEIN, PAUL M. SPINDEN [1], JAMES M. SMART, JOSEPH M. ELLIS, VICTOR C. HOWARD, RONALD R. HOLLIGER [1], LISA WHITE HARDWICK, JAMES E. WELSH, JOSEPH P. DANDURAND and ALOK AHUJA, JJ.

HAROLD L. LOWENSTEIN, Judge.

Myson Donahue ("Donahue"), tried by a Jackson County jury, was convicted of first degree murder, pursuant to Section 565.020 [2], and armed criminal action, pursuant to Section 571.015. He was sentenced by the court to life without parole on the murder conviction and a thirty-year concurrent sentence for armed criminal ac-

tion. Donahue's first point on appeal seeks a new trial under plain error review for juror misconduct, while his second point raises a question of the sufficiency of the evidence supporting the elements of deliberation and intent. The court will first address the sufficiency of the evidence.

## I. FACTUAL BACKGROUND

### A. SUFFICIENCY OF THE EVIDENCE

Where the appellant challenges the sufficiency of the evidence supporting a conviction, "[a]ppellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror could find the defendant guilty beyond a reasonable doubt." *State v. Williams*, 24 S.W.3d 101, 118 (Mo.App. 2000) (*citing State v. Ellison*, 980 S.W.2d 97, 98 (Mo.App.1998); *State v. Brown*, 996 S.W.2d 719, 728 (Mo.App.1999)). The appellate court must not act as a "super juror" exercising veto power, but, rather, must give great deference to the trier of fact. *Id.* The facts in evidence at trial are viewed in a light most favorable to the verdict. *State v. Barriner*, 111 S.W.3d 396, 397 (Mo. banc 2003).[3]

Daniel Johnson, the victim, and Amanda James ("James") met at a club in Kansas City in the late evening of October 10, 2004. At about 3:00 a.m. they left in separate cars. He forgot something in her car, and she phoned him to meet her at a nearby all-night gas station at 75th Street and Troost Avenue. She arrived first and backed her car into an area by a retaining wall at the back of the lot near the car wash. She remained in her car, facing the

---

1. The judges whose names appear above have resigned from the court since the case was submitted and are, therefore, recused.

2. All statutory references are to RSMo 2000 unless otherwise specified.

3. Donahue did not present evidence at trial, but his statement to police was in evidence.

rows of gas pumps. Behind her car arose a cement retaining wall. In back of the retaining wall was a six-foot wood privacy fence which bounded the back yards of several homes. James testified that cars were steadily coming into the station, and after a few minutes, there were twelve cars and a number of people in the area.

Shortly after parking she heard a loud "popping" noise and then everyone in the station "looked my way." She testified: "[thirty] seconds to a minute later . . . [the victim] pulled up right next to me, but he was facing the wall. As soon as he parked he had got out of his car. He started—he looked at me, started smiling, waking(sic) towards me. As soon as he took a step towards me he fell, and I heard the sound of a gun." Johnson did not get up. James saw the bullet–hole in the back of Johnson's head. James stated: "I jumped out of the car, called 911 . . . I was yelling, screaming to help him, to help me. People were looking and scared to come over there. . . . I kept running back and forth for someone to help me, but *people* were just *trying* to *leave* and get away and *get out of there.*" (Emphasis added.)

Johnson had died instantly. His body was sprawled between the two cars. James's car had a mark near the drivers' window, made by a bullet, on the back-edge of the top of her car. Photos and diagrams of the scene indicated that the two cars were within ten feet of the retaining wall and within twenty-five to thirty feet from two large overhead lighting fixtures.

The shots were determined to have come from the adjoining lot. The six foot privacy fence ended almost even with James's car, leaving a clear view of both cars. There were tall bushes or trees on the other side of the opening in the fence. Police found live shells and casings in the adjoining yard of Donahue's mother's house. The area from which the shots were fired is slightly elevated from the parking lot consistent with the slight downward angle of the path of the fatal bullet through the victim's head [4].

According to Donahue's October 9 statement, he had been celebrating his birthday in the house on the night in question with his cousin, his girlfriend, whose last name he could not remember, and the girlfriend's nephew. They had been playing games, drinking "Hennessey," and smoking "weed." Donahue had taken one and one half Ecstasy pills.

Donahue stated that when the others left, he took a sawed off rifle from his brother's dresser and went to the back fence. He stated that he could hear people and saw people and cars in the parking lot. Donahue, who stands five feet seven inches, said in his statement, in an effort to "just scare people," held the rifle over the fence with one hand and fired some five or six shots over the six foot fence in a span of thirty to forty-five seconds, the gun jamming after each shot. When he was finished he took the gun into the house, placed the gun back in the dresser, and walked to his girlfriend's house, where he stayed until 8:30 or 9:00 the next morning. Later, Donahue's brother called to ask if Donahue knew about a shooting that had taken place at the gas station. Donahue stated, "I told him I didn't know." Thereafter, Donahue went to a hotel, and one and one-half days later, called his uncle in Joplin. Donahue then went to Joplin

4. State's exhibits 14, 16 and 17, which were admitted in evidence, illustrate the proximity of Jones' car (backed in to the curb), its proximity to the victim's car, and offer the unobstructed view the shooter had of the lot below, and the almost total impossibility of the result of the two shots had they been from behind the fence. Copies of the exhibits are attached at the end of this opinion.

where his uncle told him to turn himself in to the police.

■ Under Section 565.020, a person commits first degree murder by knowingly causing the death of another after deliberation. The verdict director for first-degree murder, MAI–CR 3d 314.02, requires that: (1) the defendant caused the death of Johnson; (2) the defendant knew or was aware his conduct was practically certain to cause the death; and (3) the defendant did so after deliberation.

The record provides ample evidence of the second element that the defendant knew that his actions were practically certain to cause the death. When James parked at the back of the gas station, there were several people there and "cars were steadily coming into the station." After a few minutes James "heard a loud popping noise" and could see "everyone was just looking at me." Thirty seconds later, the victim arrived and parked next to her car. He took one step, another shot was fired, and he fell in the space between their two cars. James screamed, and "[p]eople [in the parking lot] were looking and scared to come over there." The people soon left. James dialed 911. A policeman arrived shortly and determined Johnson had been shot in the head and was dead.

Pictures taken at the scene and introduced in evidence, the testimony of Ms. James, and the statement of the defendant all confirm that the parking lot and the station were well-lighted by overhead lights located within thirty-five feet of the two cars. Moreover, there were people and cars in close proximity to the spot where Johnson fell. The testimony and exhibits showed that the area from where the shots were fired, and where rifle shells, both live and expended, were recovered, was dark, overgrown, and elevated several feet over the level of the parking lot. Most importantly, the numerous photo exhibits depict a gap of some two to three feet between the fence and bushes, offering a clear sight and direct line to both cars and to the body found between them. Photos also depict the dent on the driver's side roof of James's car left by the first shot fired just after she arrived.

In his statement to police, the defendant said he fired "about five or six" shots from a "sawed down" rifle over the six-foot fence in a 30–45 second span. The defendant said the gun jammed after each shot. After the last shot, he stated he returned to his mother's home, located just behind the gas station, put away the gun, and went to the house of his girlfriend for the night. His brother advised him the next morning that someone had been shot the night before in the gas station parking lot. He then went to a hotel, called his uncle in Joplin, and went to see the uncle who told him to turn himself in. He claims he did not know he had shot anyone or that one of his shots hit James's car.

Johnson was hit in the side of the head while standing in a well-lighted parking lot. According to the State's theory, it would have been impossible from a perch above the lot, for the defendant, who is five feet seven inches tall, to fire one-handed over a six-foot fence and with two shots, interrupted by un-jamming and reloading, hit the side of a car, and then the side of a man's head from less than thirty feet away, the bullets striking within six feet of each other. The jury, as trier of fact, could disbelieve the defendant's version from his statement and could have determined that the two shots in question were fired from the opening between the fence and bushes into a well-lit area where there were cars and people afoot and that the shooter then went behind the fence (so as not to be seen) after each shot to deal with the jammed weapon, and then reloaded. From the photographic exhibits, the jury could have reasonably concluded that

the shots were not fired from behind (and over) the fence but were fired from a level position between the fence and the bushes as one shot landed on one side of the top of James's car and the other shot struck the side of the victim's head a minute later. Shooting down into a well lighted, populated parking lot, the defendant's actions were practically certain to cause the death.[5]

The result in *State v. Whalen,* 49 S.W.3d 181 (Mo. banc 2001), is of no help to this defendant. In *Whalen,* a police officer, standing in a doorway, was shot by the defendant. Two officers behind the first were also hit by the blast but were not visible to the defendant. The Court reversed the two first-degree murder verdicts relating to the two unseen officers, finding there was not sufficient evidence the defendant knew they were there and, as such, did not attempt to cause serious injury to them. *Id.* at 185–87. In the case at bar, Johnson, standing in the well-lit lot, was clearly visible standing in plain view and was shot immediately after getting out of his car.

As to the third element, there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant deliberated. *State v. Cole,* 71 S.W.3d 163, 169 (Mo. banc 2002), permits the reliance on circumstances surrounding the crime to establish deliberation. Here, the defendant fired five to six shots, stopping to "unjam" the weapon between shots. This evidence alone was more than sufficient to establish deliberation. "Deliberation requires only a brief moment of 'cool reflection' and may be inferred from the fact

that a defendant had the opportunity to terminate an attack after it began." *Id.* The victim was not hit with the first shot; the defendant had more than sufficient opportunity to terminate the attack after he fired the first shot but before he fired the bullet that killed Johnson.

Moreover, the State's evidence, and reasonable inferences therefrom, weigh against the argument that the defendant did not deliberate nor intend to cause this murder. Right after the fatal shot was fired, James began screaming to the others in the parking lot—who immediately left the premises; it would seem likely then the defendant would have seen her, the dead body, or have heard her reaction to the shot.

Additionally, deliberation can be inferred from the defendant's flight. *State v. Ramsey,* 874 S.W.2d 414, 417 (Mo.App. 1994). Here, Donahue left the scene immediately, took the rifle back to his house, went to a girlfriend's house, to a hotel, and then out-of-town.

Neither the jury nor the trial court, nor is this court under the standard of review, able to parse the evidence here to buttress a holding that the acts of the defendant were somehow just horseplay gone awry (and, therefore, involuntary rendering this killing manslaughter.) Neither the jury nor the trial court is bound by the defendant's version of the events in question. The evidence in the record supports a verdict that Donahue deliberated and knowingly took actions practically certain to kill the victim. Point denied.

---

5.  On appeal, the defendant seems to contend that the entire lot, including the scene in question, was dim, or that the shooter could not see that people were in the lot. The defendant never contended at trial that the lot was dark. The fact that a flash was used for the pictures of James's car and the wound in the side of Johnson's head does nothing to

dispel the conclusion that the all-night gas station's parking lot and, thus, the scene were well lighted. No objection was made at trial that the seventeen pictures of the area and the proximity of the cars, the body and the adjacent gap in the fence facing the scene were not a fair and accurate representation of the aftermath of the shooting spree.

## B. Juror misconduct

In his motion for new trial and his appeal to this court, Donahue asserts that the trial court should have, *sua sponte,* declared a mistrial because of misconduct by the jury during trial. He contends that despite the court's admonishment not to discuss the evidence, during a lunch break co-counsel for the defense overheard one juror telling another: " 'I wonder if he has been in jail the whole entire two years, because this happened in 2004, or if he bonded out.' The other one said, 'I bet he's been in jail.' " Defense counsel said several other jurors probably heard the remark.

The trial judge inquired of defense counsel whether he wanted the court to conduct individual inquiry and stated, "If I uncover the fact that somebody did discuss the case, then, you know, the only remedy that I can offer is mistrial." Thereafter, defense counsel consulted with the defendant. Counsel then withdrew the request for a hearing. Judge Gray then asked Donahue if it was his decision "to press forward with the trial as it is now?" Donahue agreed that was his decision.

The trial court's decision not to conduct a hearing is reviewable for an abuse of discretion. An almost identical situation occurred in *State v. Dunn,* 21 S.W.3d 77, 83–84 (Mo.App.2000). There, the trial judge did not conduct a hearing. *Id.* at 80. The southern district of this court stated that the discussion as to being "out on bond" was not about the merits of the case, and the failure to grant the defendant a hearing was not an abuse of discretion. *Id.* at 84.

Here, where the defendant himself eschewed a hearing, the trial judge will not be convicted of error in not conducting a hearing *sua sponte.* This point is denied.

The judgment of the trial court is affirmed.

SMART, HOWARD, HARDWICK, WELSH, and AHUJA, JJ. concur in majority opinion.

ELLIS, J., dissents in separate dissenting opinion.

NEWTON, C.J., and DANDURAND, J. concur in dissenting opinion.

JOSEPH M. ELLIS, Judge, dissenting.

The events involved in this case are clearly tragic beyond measure, and the actions proven to have been taken by Appellant are not only reckless and deplorable, but stupid and senseless. However, "[d]ue process requires that, in order to convict a person of a crime, the State is required to prove beyond a reasonable doubt each and every element of the crime charged." *State v. Danikas*, 11 S.W.3d 782, 788 (Mo.App. W.D.1999). Appellant was charged and convicted of first degree murder. "To convict him of first degree murder, the State was required to prove beyond a reasonable doubt that he (1) knowingly (2) caused the death of [Mr. Johnson] (3) after deliberation upon the matter." *Id.* at 789. The State failed to prove that Appellant knowingly caused Mr. Johnson's death, much less that he deliberated. The majority's holding to the contrary is based upon unreasonable inferences, speculation, and conjecture. For this reason, I must respectfully dissent.

The evidence presented at trial reflected the following. Shortly after 3 a.m. on October 10, 2004, Amanda James pulled into an open gas station located at 75th Street and Troost Avenue and backed her car into a parking space next to a retaining wall at the back of the lot. A six-foot-high

wood privacy fence stood above the retaining wall and bounded the back yards of several homes behind the gas station. The gas station was busy and approximately twelve cars and numerous people were present in the area.

Shortly after parking, Ms. James heard a loud popping noise and noticed everyone in the station looking her direction. Thirty seconds later, Daniel Johnson, who was to meet James at the gas station, pulled into the lot and parked next to her. Mr. Johnson got out of his car, took one step toward Ms. James, and fell to the ground between the two cars as another loud popping noise rang out. Ms. James pulled forward and opened the door to her car for Mr. Johnson to get in. At that point, she noticed the bullet wound Mr. Johnson had received in the head, three inches above his right ear. She got out of her car and started screaming for help. When no one responded to her pleas, Ms. James dialed 911.

When the police arrived and examined the scene, a bullet mark was discovered on the back-edge of the top of Ms. James's car. From the bullet mark on Ms. James's car, the police determined that the shots had likely been fired from the direction of the privacy fence. Starting with an opening in the fence near the garage, officers searched through the dense foliage on the other side of the fence. Using a weed trimmer and a metal detector, the police eventually recovered one spent shell casing and 19 live rounds on the ground nine and a half feet down the fence from the opening. The spent casing and live rounds were all marked "R–E–M."

After obtaining a search warrant, the police conducted a search of the house behind the gas station at 1119 East 75th Street, where Appellant lived. From a closet, officers recovered a box of .22 caliber ammunition stamped "R–E–M," which still contained 75 out of the 100 rounds that came with the box. Officers also recovered a sawed-off .22 caliber rifle from a bedroom dresser with a live .22 caliber round in the chamber with the "R–E–M" marking. Two other rifles and several boxes of various types of ammunition were also recovered from the house.

Ballistic tests determined that the expended casing recovered behind the fence had come from the sawed-off .22 caliber rifle. During the course of testing the rifle, the expert noted a problem with the magazine that caused the rifle to jam, requiring extra effort to manually remove jammed cartridges and reload.

Appellant was subsequently arrested and brought back to Kansas City on October 13, 2004. While in transport, Appellant asked the officers if they had spoken with his uncle and also said he was sorry several times.

After being taken to an interrogation room, Appellant signed a Miranda waiver form and gave a videotaped statement. Appellant told officers that, on the night of the shooting, he had been drinking whiskey, smoking marijuana, and taking ecstasy to celebrate his birthday with his cousin, his girlfriend, and her nephew. Appellant said that after the others left he decided to shoot a gun at the people at the gas station to scare them. Appellant stated that he got the sawed-off rifle from the bedroom dresser, went up to the wood fence, and shot over the top of it multiple times. He indicated that the gun jammed after each shot and that he did not bother to retrieve the spent shells or live bullets that he dropped on the ground. Appellant indicated that after the last shot he took the gun back to the house, put it back in the dresser, and then went to spend the night with his girlfriend. Appellant told the police that the next day he found out that someone had been struck and killed by one of his bullets when his brother

called and asked if he knew anything about the shooting. Appellant stated that he then went to a hotel for a day and a half before calling his uncle in Joplin for advice. He claimed that his uncle told him to come and talk to him in Joplin and that he was going to need to turn himself in. The videotape of Appellant's statement was admitted into evidence at trial.

In reviewing a challenge to the sufficiency of the evidence to support a finding of guilt beyond a reasonable doubt, we "view the evidence in the light most favorable to the verdict and give the state the benefit of all reasonable inferences." *State v. Langdon*, 110 S.W.3d 807, 811–12 (Mo. banc 2003). "But, in so doing, courts will not supply missing evidence or give the state the benefit of unreasonable, speculative, or forced inferences." *Id.*

Viewing the evidence in accordance with this standard of review, there is simply no evidence that Appellant even knew of Mr. Johnson's presence, much less evidence proving beyond a reasonable doubt that Appellant knowingly caused the death of Mr. Johnson after deliberation upon the matter. The State failed to present any forensic evidence establishing where the shots were fired from. The opening in the fence was approximately nine and one-half feet from where the live rounds and spent casing were found. There was no evidence whatsoever that the shots were fired from the opening in the fence.

Nevertheless, the majority reasons that "[i]t would have been impossible, from a perch above the lot, for the defendant, who is five feet seven inches tall, to fire one-handed over a six-foot fence and, with two shots, interrupted by un-jamming and re-loading, hit the side of a car and then the side of a man's head from less than thirty feet away, the bullets striking within six feet of each other." *Maj. Op.* at 703. While the majority asserts that this was the State's theory at trial, nowhere in the

record does the State argue that the proximity of the bullets to each other established that it was impossible for the shot to have come from over the fence in the manner described by the Appellant. There is certainly no evidentiary support in the record for such a conclusion, and in fact, it is inconsistent with common sense and understanding. A person who is five feet seven inches tall can easily raise their hand or hands above a six-foot tall fence and fire a gun over it. Moreover, it is not at all unlikely that two shots from the same location, shot over a fence in the same way, might land within six feet of each other. So, the majority's reasoning is specious at best.

And that specious rationale is the basis upon which the majority finds that the jury could have determined, beyond a reasonable doubt, "that the two shots in question were fired from the opening between the fence and bushes into a well-lit area where there were cars and people afoot and that the shooter went behind the fence after each shot to deal with the jammed weapon." *Maj. Op.* at 703. While a jury, as the trier of fact, may disbelieve one version of facts and believe another, *State v. Brown*, 924 S.W.2d 3, 5 (Mo.App. E.D. 1996), "[s]peculation cannot serve as the basis for a jury verdict," *O'Brien v. Mansfield*, 941 S.W.2d 582, 589 (Mo.App. W.D. 1997), and "it is . . . the court's function to assure that the jury, in finding the facts, does not do so based on sheer speculation." *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993).

There is no evidentiary support in the record for the proposition that the shots were fired from the opening in the fence. The pictures of the opening in the fence, relied upon by the State and the majority, are not evidence that the gun was fired from that opening. Without testimonial evidence that the trajectory of the bullets

came from the opening, that casings were found at that location, or something more, the pictures prove nothing and cannot support an inference that the shots were fired from the opening. Thus, as noted at the outset, there is no evidence that Appellant even knew of Mr. Johnson's presence, and the majority's contentions are nothing more than sheer speculation.

Since the State failed to prove, either by direct evidence or inference, that Appellant knew Mr. Johnson was there, it obviously failed to prove beyond a reasonable doubt that Appellant "knew or was aware his conduct was practically certain to cause [Mr. Johnson's] death" as required by the verdict director for first degree murder. Logically, this conclusion precludes a finding of deliberation as well.

While this should end the discussion, for the sake of thoroughness, I will address the majority's theories regarding deliberation. The only way the majority even reaches the issue of deliberation is by continuing to rely on its "inference" that Appellant was shooting through the opening. As explained above, that inference is nothing more than unfounded speculation. Nevertheless, for the sake of argument, assuming that one reaches the issue of deliberation, the State most certainly failed to prove beyond a reasonable doubt that Appellant deliberated.

"Murder in the first degree requires proof of deliberation." *State v. Greer*, 159 S.W.3d 451, 456 (Mo.App. E.D.2005). "The requirement of proof of deliberation sets first degree murder apart from all other forms of homicide." *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004) (internal quotation omitted). While deliberation can be established through cool reflection for any length of time, it is necessary that

the evidence show that the defendant considered taking another's life in a deliberate state of mind. *State v. Miller*, 220 S.W.3d 862, 868 (Mo.App. W.D.2007). "Absent evidence of deliberation, an intentional killing is second degree murder." *Strong*, 142 S.W.3d at 717. "Deliberation may be inferred, but it must still be proved beyond a reasonable doubt." *Id.*

Based upon the fact that it took time for Appellant to clear the jam and reload the gun after firing the shot that struck Ms. James's car, the majority draws upon its inference that Appellant returned to the opening in the fence to get a clear view of the parking lot and had a clear view of Mr. Johnson [6] and concludes that a jury could determine beyond a reasonable doubt that Appellant coolly reflected upon killing Mr. Johnson. The majority reaches this conclusion notwithstanding the fact that Mr. Johnson arrived at the scene thirty seconds after the shot that struck Ms. James's car, got out of his car, and was shot before he could take a second step. The inferences relied upon by the majority are simply far too attenuated to support a finding of deliberation beyond a reasonable doubt.

The majority first asserts that the fact that Appellant fired five or six shots, stopping to unjam the weapon between shots, "was more than sufficient to establish deliberation." *Maj. Op.* at 704. The majority reasons that Mr. Johnson "was not hit with the first shot; the [Appellant] had more than sufficient opportunity to terminate the attack after he fired the first shot but before he fired the bullet that killed Johnson." *Maj. Op.* at 704. The first problem with this analysis is that Mr. Johnson didn't arrive until thirty seconds

---

**6.** The State failed to offer any plausible reason at trial why Appellant, if he took his first shot at the opening, would have chosen to move more than nine feet down the fence, through dense vegetation, in the dark, to a place with less light to un-jam the rifle and reload it and then return to the opening in the fence.

after the first shot was fired, and he was killed instantly after exiting his vehicle. There was no extended attack; Mr. Johnson was killed immediately upon his arrival. Since there was no continuing attack, there could be no opportunity to terminate the attack from which deliberation could be inferred. While *State v. Cole*, 71 S.W.3d 163, 169 (Mo. banc 2002), the case on which the majority relies, does state that "[d]eliberation requires only a brief moment of 'cool reflection' and may be inferred from the fact that a defendant had the opportunity to terminate an attack after it began," it refers to an on-going assault. In that case, the defendant broke into his ex-wife's home and was confronted by Anthony Curtis, who was visiting defendant's ex-wife. *Id.* at 168. The defendant stabbed Mr. Curtis multiple times culminating in Mr. Curtis's death. Defendant then "assaulted Terri [his ex-wife], stabbing her repeatedly in the stomach, breasts, back, and arms, and her hands when she attempted to defend herself. Terri survived." *Id.* at 168. In the case *sub judice*, there was no ongoing attack; Mr. Johnson was killed immediately upon his arrival.

Next, the majority theorizes that deliberation was proven beyond a reasonable doubt because Appellant likely heard Ms. James screaming right after Mr. Johnson was shot and Appellant "left the scene *immediately*, took the rifle back to his house, went to a girlfriend's house, to a hotel, and then out-of-town." *Maj. Op.* at 704. There are several problems with this hypothesis. Even if we infer that Appellant heard the screams and that he left immediately, those facts do not provide evidence of cool reflection beyond a reasonable doubt. There must be something about the nature of the flight or the defendant's other actions after a killing that allows for the inference of cool reflection as opposed to mere consciousness of guilt of some type of serious assault or killing.

*See State v. Franco–Amador*, 83 S.W.3d 555, 558–59 (Mo.App. W.D.2002) ("Flight does not establish a defendant's guilty knowledge of a particular crime in comparison to other possible charges and is alone insufficient to support a conviction.").

Here, after Ms. James screamed, Appellant left the scene, leaving behind live rounds and spent shells, went home, walked through the house, and put the gun in a drawer. He then went to his girlfriend's house for the evening. The following day, after being told that he had killed someone, Appellant went to a hotel for a while and later went to Joplin, Missouri, where he was arrested. Nothing about this behavior would allow a reasonable trier of fact to conclude, beyond a reasonable doubt, that Appellant fled because he had coolly reflected upon killing Mr. Johnson, as opposed to fleeing because he had shot Mr. Johnson knowing that his conduct was practically certain to cause his death (murder in the second degree), or because he had recklessly caused the death of Mr. Johnson (involuntary manslaughter).

In short, the majority's analysis is simply too attenuated, as it relies on unreasonable inferences, speculation, and conjecture. While the majority has constructed a possible way in which this crime may have occurred, the evidence does not reflect, beyond a reasonable doubt, that this was indeed what happened.

As noted at the outset, the events involved in this case are clearly tragic beyond measure. However, under the law, a criminal defendant may only be convicted of a crime that has been proven beyond a reasonable doubt. The evidence supported the conviction of Appellant for involuntary manslaughter, but, lacking sufficient evidence to establish beyond a reasonable doubt that Appellant deliberated or even that Appellant knew his ac-

tions were reasonably likely to cause the death of Mr. Johnson, he cannot properly be convicted of murder in the first or second degree. Accordingly, I would reverse Appellant's conviction for first-degree murder and remand to the trial court for entry of a judgment of conviction for involuntary manslaughter and re-sentencing.

NEWTON, C.J. and DANDURAND, J. concur in the dissenting opinion of ELLIS, J.