**STATE of Missouri, Respondent,**

v.

**Michael A. SILAS, Appellant.**

**and**

**Michael A. SILAS, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. WD 46525, WD 48161.**

Missouri Court of Appeals,
Western District.

Aug. 9, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 1994.

Application to Transfer Denied
Nov. 22, 1994.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and
LOWENSTEIN and HANNA, JJ.

HANNA, Judge.

The defendant, Michael A. Silas, appeals his conviction by a jury of murder in the first degree, § 565.020.1, RSMo 1986, and armed criminal action, § 571.015.1, RSMo 1986. He was sentenced to life imprisonment without probation or parole on the first degree murder charge, and a concurrent term of twenty years imprisonment on the armed criminal action charge. The defendant also appeals the denial of his Rule 29.15 motion for post-conviction relief following an evidentiary hearing. Pursuant to Rule 29.15($l$), the appeals have been consolidated.

The evidence, viewed in the light most favorable to the conviction, is as follows. Beth Ann Williams was living in a ground floor apartment on East 45th Street in Kansas City with her five children and her boyfriend, John Davis, Jr. The defendant, Davis and others were selling drugs out of the apartment, which was known as a "dope house."

On the evening of May 13, 1991, Raymond Thomas (the deceased) and his friend "Carlos" tried to kick in the back door of Ms. Williams' apartment. Ms. Williams paged Ernest Collins because she knew that Davis

was with Collins. She told Collins what had happened. Approximately fifteen minutes later, the defendant, Davis, Ernest Collins, and his brother Tyrone Collins arrived at Ms. Williams' apartment. All four men were dressed in black clothing. The defendant was carrying a sawed-off shotgun. Ms. Williams let them in.

Allylene Williams lived in the upstairs apartment with her daughter Jacqueline Williams and Jacqueline's two children. Allylene was looking for Thomas out her window because she was afraid he would "do something." She saw Thomas and Carlos run away from the building and then saw the defendant shoot Thomas in the head with a sawed-off shotgun.

After the shooting, Allylene's daughter, Jacqueline, went onto the front porch and saw the four men dressed in black enter Beth Ann Williams' apartment. The defendant was carrying the sawed-off shotgun, Collins had a 38–caliber pistol, and Davis had an Uzi. Inside Beth Ann Williams' apartment, Davis changed clothes and Ms. Williams told the men that she did not want the guns in her apartment. Ernest and Tyrone Collins then put the pistol and shotgun in a garbage bag. The defendant placed the bag in the trunk of Tyrone's car and the Collins brothers left. The defendant remained for a few minutes and then left with Davis in another car.

The police found Thomas lying dead on the sidewalk outside of 4441 Forest. He had a large wound on the right side of his cheek, and two wounds to the back of the head. The wounds appeared to have been made at close range by a shotgun. Some shotgun pellets, wadding and part of a shotgun shell piston were recovered from the victim's head. The police later found a nine millimeter pistol in Beth Ann Williams' apartment. The gun was jammed with several bullets in the barrel. Ballistics tests revealed that a shell casing recovered fifty feet from Thomas's body had been fired from the nine millimeter pistol recovered in Ms. Williams' apartment. Four shell casings were found near his body, all of which had been fired from the same shotgun.

The following day, the defendant and Davis returned to Ms. Williams' apartment and told Allylene that Thomas and Carlos had tried to kick in Beth Ann's door while she was at home with her five children. The defendant told Allylene that Thomas deserved what he got because he tried to break into the apartment. Allylene also testified that the defendant had bragged about the killing to two other people, and that the men had discussed how to dispose of the gun used in the shooting.

The defendant's cousin, Michael J. Silas (referred to as "defendant's cousin"), testified that he spoke to the defendant the day after the shooting. At the trial, he claimed that defendant told him, "Somebody got popped on Forest," and that this had been their only conversation about the matter. However, on May 19, 1991, the defendant's cousin made a statement to detectives that the defendant had admitted committing the murder. According to his statement, the defendant told him that he and Davis had "chased down" the victim because he had tried to break into the "dope house." The victim tried to tell the defendant that he was not involved, to which the defendant responded, "[Y]ou're about to die." He shot the victim once and then, after the victim fell to the ground, he put the shotgun up to the back of victim's head and shot several more times. The defendant told defendant's cousin that he had used a 12–gauge pump shotgun in the shooting, and bragged that the victim's "brains just splattered out" when he shot him in the back of the head.

The defendant and Davis went to Columbia, Missouri, approximately two days before their arrest. While in Columbia, Beth Ann Williams overheard defendant say that "he shot the man." Davis and the defendant said if they got caught they would blame the killing on Ernest Collins. The defendant and Davis were arrested in Columbia on June 2, 1991.

There are five points raised by the defendant. The criminal appeal raises three evidentiary matters, two arising during trial and one during jury deliberations, and one familiar point on the constitutionality of the MAI–CR3d reasonable doubt instruction. The

Rule 29.15 issue challenges the attorney's effectiveness.

■ In his first point, defendant claims the court erred by not declaring a mistrial after the state's witness, Jacqueline Williams, testified that she did not tell the police what she knew about the death of Mr. Thomas because she "was getting threats." The defendant claims that the witness's remark was irrelevant and prejudicial because it allowed the jury to speculate that the defendant had threatened the witness. The parties agree that the threats did not come from the defendant. Ms. Williams testified at the pre-trial hearing that Tyrone Collins, the brother of the defendant's co-defendant, Ernest Collins, made the threat on her life if she testified.

Prior to trial, the defendant made a motion in limine to suppress evidence of threats made to the witness. The court sustained that motion. The defendant argues that because the state did not instruct the witness to refrain from mentioning the threats, the state was at fault for the outburst, and that the statement was prejudicial in that the jury would infer that the threat came from the defendant. The defendant maintains the declaration of a mistrial was the only effective remedy.

On direct examination, Ms. Jacqueline Williams testified that shortly after the shooting, she saw the defendant run into her sister Beth Ann's apartment carrying a shotgun and in the company of three other men. She testified that she talked to the police on the night Thomas was shot, but did not tell them what she knew about the shooting. The following took place:

Q. Did you tell them anything about the shooting then?

A. Nope.

Q. Why didn't you tell them anything at that time?

A. Because I was getting threats.

Mr. Miller: I'm going to object to this. Can we approach?

[The following proceedings took place before the bench.]

Mr. Miller: This is back to our motion in limine about threats and there's no evidence this defendant threatened anybody.

Ms. Hill: I didn't expect her to say that. I will make it clear that no threats were made by this defendant and go on from there.

Mr. Miller: At this time, I move for a mistrial based on what she said.

The Court: Wait a minute. Did you explain the Court's ruling to her?

Ms. Hill: I'm sorry, I did not go into specifics with her about threats. I told her to follow my questions. I was trying to get her to talk about she really didn't want to talk about it, and that's what I expected her to say, and I think we can cure it by saying it wasn't made by this defendant.

The Court: What do you anticipate her to say?

Ms. Hill: I anticipate her to say no, it was not by him. That's in the deposition, and other statements that the threats were not Michael Silas.

Mr. Miller: And we have already had to show her the deposition several times, so—

The Court: Well, all right.

Mr. Miller: First of all, I request a mistrial based on what she just said.

The Court: The Court's going to deny that request.

Mr. Miller: Second is that you instruct the jury to disregard that question and that answer and counsel for the State be prohibited from going into anything else.

The Court: Ms. Hill says they can kind of patch it up here. Do I understand you don't want her to do that?

Mr. Miller: I don't know what this witness is going to say. If anybody patches it up, it should be me, and that way if it blows up, it's all on me.

The Court: Okay.

Ms. Hill: That's fine with me.

[The proceedings returned to open court.]

The Court: The jury will disregard the witness' last remark.

It is not uncommon for witnesses to unexpectedly volunteer inadmissible statements.[1] *State v. Brasher*, 867 S.W.2d 565, 569 (Mo. App.1993). When that does occur at trial, the action called for rests within the trial court's sound discretion. *Id.*

The declaration of a mistrial is a drastic remedy that is to be used only in the most extraordinary circumstances, and a reversal should occur only when the refusal to declare a mistrial constitutes an impermissible abuse of its discretion. *Id.* In determining whether the trial court abused its discretion, the court considers the following factors: 1) whether the statement was, in fact, voluntary and unresponsive, *State v. Masterson*, 733 S.W.2d 40, 43 (Mo.App.1987), or whether the prosecution "deliberately attempted to elicit" the comments, *State v. Davis*, 825 S.W.2d 948, 953 (Mo.App.1992); 2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution, *Brasher*, 867 S.W.2d at 569; 3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused, *Camillo v. State*, 757 S.W.2d 234, 241 (Mo.App.1988); 4) whether the court promptly sustained defense counsel's objection to the statement, *Id.*, and instructed the jury to disregard the volunteered statement, *Brasher*, 867 S.W.2d at 569; and 5) whether in view of the other evidence presented and the strength of the state's case, it appeared that the comment "played a decisive role in the determination of guilt." *Camillo*, 757 S.W.2d at 241.

We view the answer as voluntary and responsive. It was an expected answer to the question. The assistant prosecutor failed to follow the court's instructions following its ruling on the motion in limine and advise the witness to avoid testifying about threats. The problem was exacerbated by asking a question which was almost certain to elicit the prohibited response. Nevertheless, the court gave no indication that it believed the state deliberately attempted to elicit the prohibited testimony. The court was satisfied with the assistant prosecutor's explanation that she did not expect the answer given.

We are impressed with the ease in which the matter could have been remedied. The assistant prosecutor offered to have the witness testify that it was Collins who threatened her. This solution was prohibited by defense counsel's objections that the prosecution should not be allowed to question further and that he should be the one to handle the matter.[2] It would have been a simple solution to the concerns now expressed by the defendant. No further inquiry by the state was made. The defendant was given the opportunity to correct any misunderstanding the jury may have had about who made the threats. He cannot now claim error on that ground.

Further evaluating the answer, and considering the factors enumerated above, we find the statement was singular and isolated and not emphasized or magnified by the prosecution. *See Brasher*, 867 S.W.2d at 599. The witnesses's testimony did not make specific reference to the defendant as the individual who made threats. *See Camillo*, 757 S.W.2d at 241. There were four individuals involved in this crime and others who were not involved in the shooting, but were involved in the sale of crack cocaine from this house. Additionally, the court promptly sustained the defense counsel's objection to the statement and, at the request of the defendant, instructed the jury to disregard the statement. *See Brasher*, 867 S.W.2d at 569; *Camillo*, 757 S.W.2d at 241. In light of the substantial evidence of defendant's guilt, we can say with confidence that the testimony about threats played little, if any, part in the jury's determination of guilt. *See Id.* All factors considered, the defendant's point denied.

The second evidentiary ruling that the defendant challenges concerns a number of photographs depicting the injuries to the victim's head and face. The defendant claims that he was deprived of a fair trial because the probative value of the photo-

---

1. The parties have assumed the statement was inadmissible. We proceed with that understanding.

2. The record is not clear as to whether he did so.

graphs was outweighed by their prejudicial effect. He argues that the issues which the state sought to prove with the photographs, the nature of the injuries and the cause of death, were not in dispute.

One photograph was offered for the purpose of showing the location of shotgun shell casings in relation to the victim's body and it also showed the top of the victim's head with "some blood coming out." Another exhibit showed the back of the victim's head with "brain matter coming out." Two other photographs illustrated the nature and extent of the wound to the right cheek of the victim and the two shotgun wounds to the back of the head after the victim had been cleaned up.

■ The trial court is vested with broad discretion in determining the admissibility of photographs. *State v. Isa,* 850 S.W.2d 876, 890 (Mo. banc 1993). Photographs which tend to corroborate the testimony of a witness, assist the jury in understanding the facts and testimony of witnesses, or to prove an element of the state's case are admissible. *Id.*

Photographs of murder victims are gruesome more often than not, but as the *Isa* court observed, "Murder is usually gruesome." *Id.* at 891. These photographs corroborated the state's witnesses' testimony that the victim had been shot twice in the back of the head at close range. They also confirmed the accuracy of the videotaped statement made by the defendant's cousin, who stated that the defendant bragged about the crime, told the victim that he was about to die and then shot him at close range. He told his cousin that "the guy's brains just splattered out." It was the explicit nature of several of the photographs which gave them their probative value, since they corroborated and confirmed the admissions attributed to the defendant by his cousin's videotaped statement. The court did not abuse its discretion in admitting the four photographs into evidence.

■ In his next point, defendant asserts the familiar challenge to the reasonable doubt instruction and admits that his sole purpose is "to preserve it for possible future appeal in the federal court system and ... in light of the United States's Supreme Court decision in *Sullivan v. Louisiana,* [——] U.S. [——], 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)." Our Supreme Court has repeatedly held that the term "firmly convinced" is "essentially synonymous with beyond a reasonable doubt.'" *State v. Harris,* 870 S.W.2d 798, 811 (Mo. banc 1994). Further explanation would have no precedential value. *Id.* Point denied.

■ In his fourth point, the defendant claims that the court committed plain error by allowing the jury to view the videotaped statement of the defendant's cousin during jury deliberations. He argues that since the statement had been admitted as substantive evidence, it was testimonial in nature and could be shown to the jury only if it was a written or recorded confession by the defendant. The defendant concedes that since no objection was raised at trial, the point was not properly preserved for appellate review. He therefore asks this court to review the allegation for plain error pursuant to Rule 30.20.

During the closing arguments, defendant's attorney concluded by asking the jury to "[p]lease remember the evidence" and to "ask for the exhibits." The exhibits that defense counsel referred to included two videotaped statements, one by the defendant's cousin and one by Ernest Collins. During the deliberations the jury asked to see both videotapes. The attorneys and the court had anticipated such a request and had earlier discussed how it should be handled. The defendant's attorney suggested that the jury be returned to the courtroom to view the videotapes and the court followed this procedure. The courtroom was cleared and locked, and the jury permitted to view the two videotapes.

Not only was there no objection voiced by defense counsel, but the issue was not raised in a motion for new trial. The defendant waived any objection he had by arguing that the jury should ask for the exhibits and then participating in the decision as to the manner in which they would be displayed. It is rare that plain error review should be conducted when the defendant has acquiesced in the

actions that took place. The defendant can not take advantage of an error of his own making, if any error occurred. *State v. Chunn*, 701 S.W.2d 578, 588 (Mo.App.1985). The defendant's claim now is that the playing of the videotape during deliberations "unduly emphasized the statement and impermissibly bolstered the state's case...." This claim does not constitute plain error. *State v. Bailey*, 839 S.W.2d 657, 661–62 (Mo.App.1992). Point denied.

 Finally, defendant claims that his Rule 29.15 motion for post-conviction relief was erroneously denied because his trial counsel refused to allow him to testify. Following the filing of the pro se Rule 29.15 motion and the amended motion, an evidentiary hearing was held. The defendant testified at the hearing that he had wanted to testify but counsel would not allow it. Defense counsel testified that he told the defendant that it was his (defendant's) decision whether or not to testify, but had also strongly urged him not to because he "talked too much." Defense counsel testified at the 29.15 hearing:

Q. Did you refuse to let him testify at his trial?

A. Did I refuse to let him? No.

Defense counsel also testified that he advised defendant not to testify because he "made a bad witness," and counsel really did not know what the defendant would say if he took the stand. Further, counsel felt that any testimony the defendant might have given would have opened the door for the introduction, in rebuttal, of a videotaped statement the defendant made to the police.

■ Appellate review of a post-conviction motion is limited to a determination of whether the findings of fact and conclusions of law issued by the hearing court "are clearly erroneous." *State v. Nolan*, 872 S.W.2d 99, 104 (Mo. banc 1994). Trial counsel's advice to his client as to whether or not to testify is a matter of trial strategy which, barring exceptional circumstances, is not a ground for post-conviction relief. *State v. Kennedy*, 842 S.W.2d 937, 945 (Mo.App. 1992). Further, the court found counsel's testimony to be credible and that the defendant made the decision not to testify. Defer-

ence will be given to the motion court's superior opportunity to judge the credibility of the witnesses. *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991). The court was not clearly erroneous in denying the defendant's Rule 29.15 motion.

Judgments of conviction and the denial of the Rule 29.15 motion are affirmed.

All concur.