Steven A. RIOS, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 73930.

Missouri Court of Appeals,
Western District.

June 12, 2012.

Ellen H. Flottman, Columbia, MO, for appellant.

Daniel N. McPherson, Jefferson City, MO, for respondent.

Before Division Four: LISA WHITE HARDWICK, Chief Judge, Presiding, CYNTHIA L. MARTIN, Judge and KENNETH GARRETT, Special Judge.

CYNTHIA L. MARTIN, Judge.

Steven Rios ("Rios") appeals from the motion court's denial of his Rule 29.15 motion after an evidentiary hearing. Rios claims that the motion court erred in denying his motion because he received ineffective assistance of counsel to his prejudice in that trial counsel: (1) failed to investigate and call as witnesses, or examine in cross-examination, former Columbia Police

Officer Sean Moore ("Moore")[1] and Columbia Police Officer Jason Jones ("Officer Jones") on the subject of whether the unilateral vascular neck restraint technique was taught at The Law Enforcement Training Institute ("the Academy") at the University of Missouri the year that Rios attended; (2) failed to investigate and call as a witness journalist Mike Wells ("Wells") to testify regarding an article ("the Article") that he had written regarding the death of the victim, Jesse Valencia ("Valencia"), in which he purported to report Ryan Kepner's ("Kepner") statement about the time frame in which he overheard a disturbance coming from Valencia's apartment on the morning that Valencia's body was discovered; (3) failed to elicit on cross-examination of Deputy Chief of the Columbia Police Department Stephen Monticelli ("Deputy Chief Monticelli")[2] that during a phone call with Rios, during which Rios threatened suicide, Rios asked Deputy Chief Monticelli to "continue to work the case;" (4) unreasonably called DNA expert witness Dr. Dean Stetler ("Dr. Stetler") because his testimony was more harmful than helpful; and (5) failed to call Rios to testify on his own behalf despite his wish to do so. We affirm.

### Factual and Procedural History[3]

On June 5, 2004, college student Valencia was found murdered in a field outside his apartment. Valencia's throat had been slit. Valencia had been involved in a sexual relationship with Rios just prior to his death. During the relationship with Valencia, and at the time of Valencia's murder, Rios was employed as a Columbia, Missouri, police officer.

In 2005, Rios was tried and convicted of murder in the first degree and armed criminal action. The conviction was reversed, and the case remanded for a new trial in *State v. Rios*, 234 S.W.3d 412 (Mo. App. W.D.2007), due to the trial court's error in admitting two hearsay statements made by Valencia.

In December 2008, Rios was re-tried by a jury and found guilty of murder in the second degree and armed criminal action. The jury recommended sentences of life imprisonment for murder in the second degree and twenty-three years imprisonment for armed criminal action. On January 16, 2009, the trial court imposed the sentences recommended by the jury and ordered that they be served consecutively. Rios's convictions were affirmed on direct appeal in *State v. Rios*, 314 S.W.3d 414 (Mo.App. W.D.2010).

On September 27, 2010, Rios timely filed his *pro se* Rule 29.15 motion. Rios was appointed post-conviction counsel who timely filed an amended Rule 29.15 motion. After an evidentiary hearing, the motion court denied Rios's motion. Rios appeals.

### Standard of Review

"Appellate review of the trial court's action on the motion filed under [ ] Rule 29.15 shall be limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." Rule 29.15(k). " 'The motion court's findings and conclusions are clearly erroneous if, after a review of the entire record, we are left with the definite and firm impression that a mistake has been made.' " *Roberts v. State*, 356 S.W.3d 196, 199 (Mo.

---

1.  At the time of trial, Moore worked as a real estate broker.

2.  At the time of trial, Deputy Chief Monticelli was a captain with the Columbia Police Department.

3.  The facts are viewed in the light most favorable to the verdict. *State v. Donahue*, 280 S.W.3d 700, 701 (Mo.App. W.D.2009).

App. W.D.2011) (quoting *Clay v. State*, 310 S.W.3d 733, 735 (Mo.App. W.D.2010)).

## Analysis

To establish ineffective assistance of counsel, Rios must prove by a preponderance of the evidence: "(1) that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney; and (2) that [Rios] was thereby prejudiced." *Haskett v. State*, 152 S.W.3d 906, 909 (Mo.App. W.D. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). If Rios fails to demonstrate either prong of the *Strickland* test, his post-conviction motion will be denied. *Id.*

To establish the performance prong, Rios bears a heavy burden "and must overcome a strong presumption that [his] counsel provided competent assistance." *Deck v. State*, 68 S.W.3d 418, 425 (Mo. banc 2002). Rios must demonstrate " 'that counsel's representation fell below an objective standard of reasonableness.' " *Id.* at 426 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). To demonstrate this, Rios "must identify specific acts or omissions of counsel that resulted from unreasonable professional judgment, and the 'court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.' " *Id.* (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). We judge the reasonableness of counsel's conduct based on the facts of each case. *Williams v. State*, 205 S.W.3d 300, 305 (Mo.App. W.D.2006).

To establish prejudice, Rios must show that there is a reasonable probability that but for his counsel's ineffectiveness, the result would have been different. *Patterson v. State*, 110 S.W.3d 896, 900 (Mo.App. W.D.2003). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (citations omitted). A showing of error that could have a conceivable effect on the outcome is insufficient. *Williams*, 205 S.W.3d at 305.

## Point I

In Rios's first point on appeal, he contends that trial counsel was ineffective in failing to elicit testimony from Moore and Officer Jones [4] regarding whether the unilateral vascular neck restraint ("the Restraint") was taught at the Academy the year Rios attended. Rios argues that evidence that the Restraint was not taught was relevant to the question of guilt because the State presented testimony from Academy trainer Todd Burke ("Burke") that Rios would have been taught the Restraint at the Academy, and testimony from medical examiner Dr. Valerie Rao ("Dr. Rao") that the bruises on Valencia's body were consistent with a rough application of the Restraint. We disagree.

To succeed on his claims of ineffective assistance of counsel for failing to elicit testimony from Moore and Officer Jones on the subject of the Restraint being taught at the Academy, Rios must show that: "(1) [trial] counsel knew or should have known of the existence of the witness, (2) the witness could be located through a reasonable investigation, (3) the witness would testify, and (4) the testimony of the witness would have produced a viable defense." *Hays v. State*, 360 S.W.3d 304, 309–10 (Mo.App. W.D.2012). " 'The selection of witnesses is a virtually unchallengeable question of trial strategy.' " *Id.*

4. We note that Officer Jones and Moore both testified at trial. Rios is thus complaining that trial counsel was ineffective for failing to elicit testimony from both witnesses regarding whether the Restraint was taught at the Academy the year that Rios attended.

(quoting *State v. Kreutzer*, 928 S.W.2d 854, 877 (Mo. banc 1996)). "The decision not to call a witness 'will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise.'" *Id.* (quoting *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004)). "In virtually every case, the extent of cross-examination must be left to the judgment of counsel." *Davidson v. State*, 308 S.W.3d 311, 317 (Mo.App. E.D.2010); *Rousan v. State*, 48 S.W.3d 576, 594 (Mo. banc 2001).

Here, both Moore and Officer Jones testified at trial. There is no issue, therefore, that their existence was known, they could be located, and that they would testify. The only determination that remains is whether their testimony about whether they were taught the Restraint at the Academy would have produced a viable defense.

At trial, Burke testified that he was an instructor at the Academy in 1997, the year Rios attended. Burke specifically recalled that he taught Rios and that Rios would have been taught the Restraint that year. Burke identified an exhibit [5] as the "End Course Summary" for Rios and testified that it reflected that Rios had taken the defensive tactics class taught by Burke in which the Restraint was taught as part of the curriculum. Burke testified that he demonstrated the Restraint to Dr. Rao. Dr. Rao testified that Valencia's injuries were consistent with a rough application of the Restraint.

At the post-conviction evidentiary hearing, Moore testified that he was friends with Rios and attended the Academy with him in 1997. Moore testified that he did not recall whether the Restraint was taught. Moore stated that, "We could have very well been taught. I could have

missed that day. I just, I honestly can't tell you whether it was taught or not taught." On cross-examination, Moore further stated:

> I very well could have been [taught the Restraint]. I mean, my problem is, I know [the Restraint], I was trained in it. I don't recall where originally. So yeah, I don't know if I learned it in the academy or didn't. We could have very well been taught in the academy.

Moore testified that his answer would have been the same had he been so questioned at the 2008 jury trial. Moore also testified that had he been asked whether he had ever seen Rios use restraints or chokeholds, he would have answered in the affirmative. Moore stated, "[Rios] was a likeable, jokable [sic] guy. And I can recall, you know, [Rios] coming up behind you and putting you in a neck hold at the department and in a casual, you know, playful manner," on more than one occasion.

Officer Jones testified at the post-conviction hearing that he attended the Academy in 1997 with Moore and Rios; that he did not recall whether he was taught the Restraint but he could not rule it out; and that his testimony would have been the same had he been asked these questions at the 2008 jury trial.

Trial counsel testified that he did not recall why he did not ask either Moore or Officer Jones if they had been taught the Restraint at the Academy.

The motion court held:

> [T]he testimony of these witnesses at the evidentiary hearing was equivocal. Both admitted that they did not remember whether [the Restraint] was taught or not. This court specifically finds that the testimony of these two witnesses on

---

5. This exhibit was not included in the record on appeal.

this issue would not have provided a viable defense. The equivocal testimony would not have damaged the State's case. In fact, had the door been opened, Sean Moore would have testified that [Rios] sometimes came up from behind other officers and put them in choke holds. This testimony would have strengthened the State's case, not weakened it. [Trial counsel] was not ineffective for not calling these two witnesses to give this testimony.

We agree with the motion court that the testimony of Moore and Officer Jones would not have provided Rios with a viable defense. Neither witness testified at the post-conviction hearing that the Restraint was not taught at the Academy the year Rios attended. At best, as the motion court concluded, their testimony was equivocal.

■ Rios relies on *Perkey v. State*, 68 S.W.3d 547 (Mo.App. W.D.2001) and *Cravens v. State*, 50 S.W.3d 290 (Mo.App. S.D.2001) for his assertion that trial counsel can be found ineffective for failing to present evidence in an accused's defense. In *Perkey*, this court held that trial counsel failed to interview and call a witness who would have contradicted testimony about the victim's cause of death, and that the testimony could have changed the outcome of the trial. 68 S.W.3d at 552. In *Cravens*, the court found that counsel's failure to investigate obtaining an expert witness was ineffective where there was reasonable probability that the result of the trial would have differed had the expert testified. 50 S.W.3d at 295. Both cases are distinguishable. Rios concedes in his brief that "Moore and Jones did not recall precisely whether they were taught the [R]estraint in the [A]cademy." Rios nonetheless claims the testimony would have impeached Burke. Even if this suspect proposition is accepted as true, when

the testimony of a witness will only impeach another witnesses without negating an element of the crime for which the movant has been convicted, the testimony fails to provide the movant with a viable defense. *Ferguson v. State*, 325 S.W.3d 400, 416–17 (Mo.App. W.D.2010). Rios has failed to persuasively demonstrate that the testimony of Moore and Officer Jones would have negated an element of the crime for which he was convicted as to provide him with a viable defense.

■ In fact, we agree with the motion court's determination that Moore's testimony would have been favorable to the State. "[Trial counsel] cannot be indicted as ineffective for failing to call a witness whose testimony could open up an unfavorable avenue of cross-examination." *Roberts*, 356 S.W.3d at 203. Here, had trial counsel questioned Moore regarding the Restraint, the State could have asked Moore whether he had seen Rios use the Restraint. Moore's testimony that he had witnessed Rios use restraints/choke holds would have lent weight to Burke's testimony that Rios was taught the Restraint and to Dr. Rao's testimony that Valencia's injuries were consistent with a rough application of the Restraint. " 'If a potential witness's testimony would not unqualifiedly support [the defense], the failure to call such a witness does not constitute ineffective assistance.' " *Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005) (citation omitted).

Rios has not met his burden of establishing that the testimony of Moore and Officer Jones about whether the Restraint was taught at the Academy would have provided a viable defense or created a reasonable probability that the result at trial would have been different. The motion court's findings are not clearly erroneous. Point one is denied.

## Point II

◼ For his second point on appeal, Rios contends that his trial counsel was ineffective in failing to investigate and call journalist Wells as a witness to testify regarding the Article in which he reported Kepner's statement about the time frame of a disturbance coming from Valencia's apartment on the morning that Valencia's body was discovered. Rios claims that Wells could testify that Kepner, Valencia's next door neighbor, told Wells that the disturbance occurred between 3:30 a.m. and 4:00 a.m., which contradicted Kepner's trial testimony that he could only be certain that the disturbance occurred between 3:00 a.m. and 10:00 a.m. Rios argues that Wells's testimony regarding the time frame of the disturbance was critical to his alibi that he was drinking with other officers from 3:00 a.m. to approximately 4:45 a.m. Rios argues that a reasonably competent attorney would have called Wells to testify about Kepner's prior inconsistent statement. We disagree.

We have already articulated in our discussion of Rios's first point on appeal the difficult hurdle Rios must overcome to establish a claim of ineffective assistance of counsel based on the failure to call a witness at trial. Essential to discussion of this point on appeal, Rios must establish that Wells's testimony would have provided him with a viable defense by negating an element of the crime. *Id.*

At trial, Kepner testified that at 3:00 a.m. on the morning that Valencia's body was later found, he returned home from drinking with friends and went to bed. Kepner stated that he was awakened by what sounded like a drunk person bumping into the wall coming from Valencia's apartment and an annoyed, slurred voice saying, "Stop it, Stop it." Kepner heard a second voice but could not make out any words. Kepner said he yelled from his bed that it was late and to stop it. The noises stopped. Kepner stated that he could not be sure when this occurred. Kepner stated that he got up around 10:00 a.m., ate breakfast, and then exited his apartment. He observed that Valencia's door was halfway open which was unusual.

On cross-examination, trial counsel confronted Kepner with his prior inconsistent statement to the police. Kepner conceded that he previously gave sworn testimony that he believed he had not been asleep for very long when he was awakened by the disturbance in Valencia's apartment. Kepner also conceded that he previously told police officers the disturbance occurred between 3:30 a.m. and 4:30 a.m., explaining he had given them a "guesstimate" because "that's what it felt like."

At the post-conviction evidentiary hearing, trial counsel testified that the Article was located in his trial file, though he did not specifically recall having the Article or any other newspaper articles. Trial counsel read the following portion of the Article aloud:

> Valencia's basement neighbor, Ryan Kepner, said yesterday he heard bumping noises coming from the student's apartment early Saturday as Valencia was repeatedly saying, 'Stop it' and 'No' for about five minutes. That was between 3:30 and 4 a.m.

Trial counsel agreed that evidence narrowing the time frame of the occurrence of the disturbance would have aided the defense because the defense strategy was focused on establishing a clean timeline to establish Rios's alibi. Trial counsel agreed that other evidence at trial established that Rios was present at the police station with other officers between 3:00 a.m. and close to 5:00 a.m. Trial counsel explained that he did not call Wells because he was not aware of the Article. Trial counsel also testified, however, that even had he called

Wells, the State could have pointed out that a person is not under oath when they talk to a newspaper reporter and that newspaper articles are not always accurate.

Wells's deposition taken on February 8, 2011, was admitted as "Exhibit 1" and the Article was admitted as "Exhibit 3." [6]

> The motion court held:
>
> Kepner testified at the jury trial that he came home drunk around 3:00 a.m. and went to bed. During the night, he heard sounds consisting of bumping on the wall and a voice saying, "Stop it. Stop it." During direct examination, Kepner testified that the noises could have occurred anywhere between 3:00 a.m. and 10:00 a.m. He admitted that he had been intoxicated and that it was hard to estimate the time. [Rios] claims [trial counsel] was ineffective for not calling newspaper reporter Mike Wells to testify that he had interviewed Christopher Ryan Kepner while putting together a newspaper story about the case that ran on June 8, 2004. Kepner allegedly told Wells in the course of an interview that the noises occurred between 3:30 a.m. and 4:00 a.m. The court finds that this testimony would not have provided a viable defense. It was clear to the jury that Kepner was intoxicated when he went to bed and that he heard the noises sometime during the night, but really had no idea what time he heard them. Kepner was under oath when he testified at the jury trial. Obviously, he was not under oath if and

when he talked to a newspaper reporter. At deposition, Mike Wells admitted that he has no memory of the conversation, he did not record it, and he cannot say he has never put mistaken facts into a newspaper story. His testimony would not have been sufficient to cause a reasonable possibility that the result of the trial would have been different. [Trial counsel] was not ineffective for failing to call this newspaper reporter as a witness.

■ We agree with the findings of the motion court. Kepner was effectively cross-examined by trial counsel about his prior inconsistent statement to the police regarding the time frame during which he heard the disturbance in Valencia's apartment. The proposed testimony by Wells would merely have been cumulative of Kepner's cross-examination testimony. "[T]rial counsel is not ineffective for failing to offer cumulative evidence." *Forrest v. State*, 290 S.W.3d 704, 710 (Mo. banc 2009). Even had Wells testified that Kepner told him the disturbance occurred between 3:30 a.m. and 4:00 a.m., Kepner explained at trial that his earlier statement about the precise time frame of the disturbance was not a certainty, but a "guesstimate." Thus, Wells's testimony would not have afforded Rios with a viable defense.[7] When the testimony of a witness will only impeach the State's witness, "'relief on a claim of ineffective assistance of counsel is not warranted.'" *Hays v. State*, 360 S.W.3d at 310 (citation omitted).

---

**6.** Although Wells's deposition has been included in the record on appeal, the Article has not.

**7.** We need not address whether, under general principles of evidence in Missouri, it would have been appropriate to permit Wells to testify about Kepner's prior inconsistent statement without first confronting Kepner with the prior statement to give him an opportunity to admit or deny the statement. Pursuant to section 491.074, "[n]otwithstanding any other provisions of law to the contrary, a prior inconsistent statement of any witness testifying in the trial of a criminal offense shall be received as substantive evidence, and the party offering the prior inconsistent statement may argue the truth of such statement."

Rios has failed to demonstrate that trial counsel was ineffective for failing to call Wells to testify at trial. Rios has also failed to demonstrate prejudice, as there is no reasonable probability that the result of the trial would have been different had Wells been called to testify in light of Kepner's admission on cross-examination that he previously told the police in a sworn statement that the disturbance occurred between 3:30 and 4:30 a.m.

The motion court's findings were not clearly erroneous. Point two is denied.

### Point III

■ For his third point, Rios claims that the motion court erred in denying his motion for post-conviction relief because he received ineffective assistance of counsel when trial counsel failed to elicit cross-examination testimony from Deputy Chief Monticelli that when Rios threatened suicide, Rios asked Deputy Chief Monticelli to "continue to work the case." Rios claims that this evidence would have been relevant to demonstrate Rios's mental state and to give the jury a reason to believe that Rios was not the person responsible for Valencia's death. We disagree.

■ "The extent of cross-examination is usually a matter of trial strategy." *Rousan*, 48 S.W.3d at 594. A movant does not overcome the strong presumption that counsel had a strategic reason for his decision even where trial counsel fails to verbalize a trial strategy for his decision. *Bullock v. State*, 238 S.W.3d 710, 715 (Mo. App. S.D.2007). In addition, as we have already established, trial counsel's failure to elicit testimony from a witness is not ineffective unless the testimony would have afforded the movant with a viable defense.

At trial, the State presented evidence regarding Rios's two threats of suicide.

The first incident occurred when Rios contacted Deputy Chief Monticelli by phone on June 10, 2004, after being questioned by investigators. During the phone call, Rios told Deputy Chief Monticelli that he had purchased a shotgun and ammunition. Deputy Chief Monticelli testified that he told Rios that they were going to clear him, that he had support from the police department, and that his family loved and supported him. Deputy Chief Monticelli testified that Rios asked him to "take care of his family." At some point in the conversation, Deputy Chief Monticelli determined that he was agitating Rios so he placed Rios on the phone with Detective John Short ("Detective Short"), a crisis negotiator. Detective Short testified that Rios repeated to him that he had a shotgun and ammunition and was thinking about killing himself. Sergeant Kenneth Hammond ("Sergeant Hammond") was instructed to respond to Rios's father's residence, where Rios was believed to be heading. Once there, Sergeant Hammond engaged in several phone conversations with Rios for several hours until Rios arrived at the residence. Rios was then taken to Mid–Missouri Mental Health Center ("the Center").

The second incident occurred the following day when Rios escaped from the Center. Sergeant Timothy Moriarity ("Sergeant Moriarity") testified that when he responded to a nearby parking garage where Rios had fled, Rios threatened to jump from a ledge. Rios eventually surrendered without struggle.

In closing argument, the State argued:

His behavior by attempting suicide, by buying a shotgun and saying he was going to kill himself, that's not the actions of an innocent man. His behavior by jumping over the wall at the mental health center, running and getting up on

the ledge and talking about jumping, that's not the behavior of an innocent man. His actions since this crime, ladies and gentlemen, have not been the actions of an innocent man.

At the post-conviction evidentiary hearing, Deputy Chief Monticelli stated that he made a report about his June 10, 2004 conversation with Rios. The report was admitted into evidence.[8] Deputy Chief Monticelli testified that the report reflects that Rios told him "to continue to work the case" in addition to asking him to take care of his family. Chief Deputy Monticelli stated that he would have testified regarding this statement by Rios had he been asked at trial.

Trial counsel conceded that Chief Deputy Monticelli's report reflected that Rios asked Monticelli to "continue to work the case." Trial counsel conceded that a copy of Chief Deputy Monticelli's report was in his trial file. Trial counsel testified that he had no explanation for his decision not to elicit this statement during cross-examination of Chief Deputy Monticelli.

The motion court found:

This comment, however, was unimportant when compared to the other evidence and testimony in the case. The jury would have perceived it as simply one more lie told by the defendant, who denied he had committed the murder and never confessed to it. The testimony would not have made a difference in the outcome of the trial. [Trial counsel] was not ineffective for failing to elicit this comment from Monticelli during cross-examination.

We agree with the motion court. Though trial counsel could not recall or identify his strategy in failing to elicit testimony from Chief Deputy Monticelli about Rios's claimed exculpatory comment, that alone "does not overcome the strong presumption that counsel had a strategic reason for [his decision]." *Bullock*, 238 S.W.3d at 715. More to the point, as the motion court found, Rios fails to demonstrate prejudice.

Rios's statement to Chief Deputy Monticelli to "continue to work the case" does not negate the other evidence of Rios's guilt which included: strands of Rios's hair that were found on Valencia's body; Rios's DNA that was found under Valencia's fingernails; the bruising on Valencia's body consistent with a rough application of the Restraint; and that Rios was taught the Restraint.

Likewise, Rios's suicide threats were not the only behavior the State argued as being inconsistent with innocence. Prior to referencing the suicide attempts, the State pointed to Rios's denial of a sexual relationship with Valencia and the many lies he told investigators and his wife as other actions inconsistent with innocence.

Rios argues that if the statement had been elicited, the jury would have concluded that Rios's suicide attempts resulted from his embarrassment over media revelations, and not because he was guilty. However, for this purpose, the statement would have been cumulative. Sergeant Hammond testified that when the officers were trying to talk Rios off the ledge during the second suicide attempt, Rios stated that he was upset and could not handle the media attention. "[T]rial counsel is not ineffective for failing to offer cumulative evidence." *Forrest*, 290 S.W.3d at 710.

---

8. Although Rios cites to this report in his brief as "Exhibit 4," it has not been included in the record on appeal.

It is also worth noting that Rios made other statements that would tend to negate the jury's willingness to conclude that Rios's statement about "continuing to work the case" evidenced his innocence. For example, Detective Jeff Westbrook ("Detective Westbrook") testified that he had a conversation with Rios in between the two suicide threats where Rios told him that if he had killed Valencia, he would have killed himself. When Detective Westbrook confronted Rios with the fact that he had threatened suicide just two hours prior, Rios "looked [Detective Westbrook] right in the eye and [ ] said, I just couldn't go through with it." These statements could be interpreted as evidence of guilt.

Rios cites to *Black v. State*, 151 S.W.3d 49 (Mo. banc 2004), where counsel was found to be ineffective for failing to impeach a witness with a prior inconsistent statement on the central issue in the case. Rios concedes that we are not dealing with a case where trial counsel failed to impeach a witness with a prior inconsistent statement. Instead, Rios seems to argue that failure to elicit a prior complete statement should be similarly treated. Rios offers no authority for this position. " 'Rule 84.04(d) requires that an Appellant provide appropriate citation to authority in support of his contentions. If no authority exists on the issue, an explanation for the absence of authority is required. If no explanation is given, we may consider the point to be abandoned.' " *Roberts*, 356 S.W.3d at 205 (citation omitted).

The motion court's findings are not clearly erroneous. Point three is denied.

### Point IV

For his fourth point, Rios claims the motion court clearly erred in denying his motion for post-conviction relief be-cause he received ineffective assistance of counsel because trial counsel unreasonably called Dr. Stetler to testify as a witness when Dr. Stetler's testimony was more harmful than helpful, and was used against Rios by the State. We disagree.

The selection of witnesses and the introduction of evidence are questions of trial strategy which do not provide a basis for post-conviction relief. *Placke v. State*, 341 S.W.3d 812, 817 (Mo.App. S.D. 2011). " 'Defense counsel is not obligated to shop for an expert witness who might provide more favorable testimony.' " *Goodwin v. State*, 191 S.W.3d 20, 29 (Mo. banc 2006) (citations omitted). " '[C]ounsel is allowed wide latitude in conducting the defense and is entitled to use his or her best judgment in matters of trial strategy.' " *Placke*, 341 S.W.3d at 817 (citation omitted). A movant does not overcome the strong presumption that counsel had a strategic reason for his decision even where trial counsel fails to verbalize a trial strategy for his decision. *Bullock*, 238 S.W.3d at 715.

At trial, the State presented DNA evidence through the testimony of Highway Patrol DNA criminalist Jason Wyckoff, and Kim Gorman, a DNA analyst for PTC Laboratories in Columbia. These two experts provided testimony that hairs recovered from Valencia's body were consistent with Rios's DNA profile, that a DNA analysis of fingernail clippings from Valencia showed a mixture of DNA from at least Valencia, Rios, and Edward McDevitt (McDevitt); [9] that there was not a clear major contributor to the mixture of DNA from the fingernail clippings; that there is no way of knowing how long the DNA had been present in that DNA could remain in place for years; and that the presence of

---

9. McDevitt was also in a relationship with Valencia at the time of Valencia's death.

DNA under the fingernails had no bearing on how it got there.

Dr. Stetler testified that the DNA found in the fingernail clippings was of a miniscule portion—7.8 nanograms. Dr. Stetler explained that one nanogram equals one billionth of a gram. He testified that there was no way to determine whether the DNA came from seminal fluid, blood, saliva, urine or some other source. He also testified that Valencia was the "major" contributor of the combined DNA, that Rios contributed 22%, and that McDevitt contributed 11%. Dr. Stetler further explained, however, that the percentages carried no significance as to *when* the DNA got under the fingernails; that even the 22% he attributed to Rios was a "miniscule" amount that came from a miniscule amount of fluid; that DNA is transferable; that this amount of DNA could be transferred from scratching one's fingernails across a person's arm; and that he would not be surprised to see that amount of DNA from a scratch that occurred during a sexual encounter. On cross-examination, Dr. Stetler testified that he also would not be surprised to find that amount of DNA from a scratch inflicted during a struggle.

In closing argument, the State argued that Dr. Stetler's testimony favored its case in that there was double the amount of Rios's DNA compared to McDevitt's in the combined DNA sample found under Valencia's fingernails, and because the amount of DNA present was consistent with scratching someone.

At the post-conviction evidentiary hearing, trial counsel did not dispute that the two DNA experts called by the State had not testified to the percentages of the combined DNA sample attributable to Rios, McDevitt, and Valencia. Trial counsel agreed that Dr. Stetler's testimony that there was twice as much DNA attributable to Rios as compared to McDevitt could, without further explanation, be unfavorably interpreted by the jury. Trial counsel also conceded that Dr. Stetler's concession on cross-examination that the amount of Rios's DNA in the combined sample was consistent with a scratch during a struggle could be unfavorably interpreted. Trial counsel testified that he did not specifically remember why he called Dr. Stetler to testify, but that he would have weighed the pros and cons and determined the pros outweighed the cons. Trial counsel pointed out that Dr. Stetler testified that it was impossible to say how long DNA would last under a fingernail, suggesting the source of Rios's DNA could have significantly predated Valencia's murder.

The motion court held:

> Dr. Stetler offered testimony favorable to the defense during his direct examination, including testimony that the DNA taken from underneath the victim's fingernails was a miniscule amount and that there have been no studies indicating how long a person's DNA could stay under the fingernails of someone like the victim, thereby questioning the State's theory that the DNA under the victim's fingernails would have come from a struggle at the time of the victim's death. During cross-examination, the prosecutor got Dr. Stetler to admit that there was twice as much of [Rios's] DNA under the victim's fingernail than there was from the victim's recent lover and that the location where the DNA was left was consistent with one person scratching another person during a struggle. The effective cross-examination by the prosecutor did not make [trial counsel] ineffective for calling his own DNA expert in the case. It was reasonable for the defense to want to emphasize the miniscule amount of the suspect's DNA that had been under the

victim's fingernails, and the possibility that [Rios's] DNA had remained underneath the victim's fingernails from a past sexual encounter as opposed to a recent struggle, even though the State's witnesses had conceded the point. Furthermore, it cannot be said that a decision not to call Dr. Stetler as a witness would have made a difference in the outcome of the case. The DNA under the fingernails was a mixture. The amount involved was only 7.8 nanograms, with a nanogram being a billionth of a gram. Dr. Stetler testified to the jury that quantities of each contributor to the DNA under the fingernails bore no significance. It cannot be said that it was a mistake to call Dr. Stetler as a witness or that his testimony made a difference in the outcome of the trial.

We agree with the motion court. It is conceded by Rios that trial counsel reviewed Dr. Stetler's testimony from the first trial and interviewed him before the second trial. Although trial counsel admitted at the evidentiary hearing that some of Dr. Stetler's testimony might be interpreted negatively by the jury, he also testified that he weighed the pros and cons of Dr. Stetler's testimony before calling him as a witness. As pointed out by the motion court, Dr. Stetler's testimony emphasized the miniscule amount of the DNA sample that was tested. Moreover, immediately after testifying to the percentages, Dr. Stetler negated their significance. Though Dr. Stetler testified that he would not be surprised to find the amount of DNA attributable to Rios as a result of a scratch, he testified the scratch could have been during a sexual encounter or a struggle. Dr. Stetler also testified that DNA is extremely transferable. Rios has failed to rebut the presumption that calling Dr. Stetler to testify was a reasonable trial strategy.

Rios cites to *Gant v. State*, 211 S.W.3d 655 (Mo.App. W.D.2007), for the proposition that trial counsel's admission of evidence tending to support the State's position can be a significant factor in finding ineffective assistance of counsel. In *Gant*, trial counsel was found ineffective where the State's ability to establish probable cause for Gant's arrest depended exclusively on Gant's cross-examination of the State's witness at a suppression hearing. *Id.* at 659. Here, in contrast, the State's witnesses had already testified about the presence of Rios's DNA under Valencia's fingernails. Dr. Stetler's testimony did not exclusively establish an essential element of the State's case.

The motion court's findings are not clearly erroneous. Point four is denied.

### Point V

For his fifth and final point, Rios claims that the motion court erred in denying his motion for post-conviction relief because he received ineffective assistance of counsel when trial counsel failed to call Rios to testify on his own behalf despite his wish to do so. We disagree.

"Criminal defendants have a fundamental right to testify in their own defense. Only the defendant can waive the right to testify." *Davidson v. State*, 308 S.W.3d 311, 319 (Mo.App. E.D.2010). "[I]f the defendant did in fact make a knowing waiver, then trial counsel's advice on whether or not to testify generally will be a matter of trial strategy" which is not a basis for post-conviction relief. *Id.*

Rios fails to establish the predicate supposition of his argument. He fails to establish that he wanted to testify, but was denied the opportunity to do so. At trial, the following exchange occurred between the trial court and Rios:

THE COURT: Mr. Rios is not under oath, but I am required by law to explain certain rights to you. Do you understand that you have the right to take the witness stand in your case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you also understand that you have the right not to take the witness stand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, let me first of all talk about if you do take the witness stand. You understand that if you do take the witness stand and your attorney asks you questions and you offer answers to those questions or you volunteer something that even he doesn't ask you about, that the State would have the right to question you about any subject that was covered in what we call your direct examination? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: In that connection, for instance, [trial counsel] could ask you a question about what was the weather that day, and if you remarked instead of answering his question about something else, I was driving a black car—

THE DEFENDANT: I open the door to the prosecutor.

THE COURT:—the prosecutor would be able to talk to you about the car even though [trial counsel] didn't want to talk to you about the car, but if you volunteered it, you would open yourself to cross-examination on that area. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you also understand that if you do not testify in this case, the prosecutor can in no way make any comment about your failure to testify? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that if you do not testify in this case, your attorney would have the right to ask for an instruction that would tell the jury that you're not testifying should in no way be considered by them as evidence of either guilt or innocence? Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: In other words, [the prosecutor] cannot comment on your failure to testify and your attorney's entitled to an instruction that the jury would be told that if you do not testify—and by the same token, he does not have to give that instruction. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, understanding these facts, this is the one part of the trial where [trial counsel] really doesn't control it. [Trial counsel], as your attorney, can give you his advice and his counsel as to what he thinks you should do, but this is the one area—in other words, he can make decisions about who to call on your behalf, what to ask witnesses, he doesn't even have to have your consent to do that. He could get it and he can talk to you about it and ask you for your advice, but he—he has the right as your attorney to do certain things. But this is the one area where you have to make the final decision, not [Trial counsel]. Do you understand that? He can—let me put it this way: [Trial counsel] can say, in my judgment, you should not testify. You have the right to say, [Trial counsel], I do want to

testify. By the same token, he can say, You have the right. I want you to testify and need for you to testify. And you have the right to say, No, I do not want to testify. Do you understand that this is the only time in this trial that you have—you are really going to call the shot? You are going to decide whether you will or will not testify.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, having explained these rights to you—I'm not asking you to make a decision at this point. I'm not asking your attorney to tell me what you're going to do at this point, but do you understand these rights and do you understand that when we reach that point in the trial where [Trial counsel] either wants to put you on the stand or not put you on the stand that you're the one that's going to have to make the final decision in this case about that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Will it be your decision?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Thank you.

The trial record does not indicate any further discussion with Rios about his decision whether to testify.

At the post-conviction evidentiary hearing, trial counsel testified that he talked with Rios about whether or not Rios would testify as the trial progressed and that it was a "game-day" decision. Trial counsel stated as some point mid-trial, in discussing their anticipated defense, he and Rios had a conversation regarding whether Rios would testify. Although trial counsel did not have a specific recollection about when that discussion took place, he knew that he and Rios had at least one significant discussion about the pros and cons of Rios testifying. This included discussion of the unfavorable impressions Rios's father and Rios's previous attorney had about Rios's testimony in his first trial. Trial counsel testified that he advised Rios that he did not think it was in his best interests to testify based on how he came across at the first trial. Trial counsel stated, "It was always Mr. Rios's decision on whether or not he wanted to testify." Trial counsel testified that Rios ultimately made the decision not to testify.

Rios testified that before trial, he told trial counsel that he wanted to testify. Rios testified that trial counsel announced that the defense was resting after the last defense witness finished testifying without calling Rios. Rios stated that had he testified, his testimony would have been consistent with his testimony from the first trial. Rios admitted that he testified in the first trial and was found guilty of first degree murder, and that without testifying in the second trial, he was convicted of the lesser charge of second degree murder. Rios conceded that he did not do anything to remind trial counsel of his desire to testify after trial counsel rested the defense's case.

The motion court found:

This claim was completely refuted by the testimony of [trial counsel]. The decision whether to testify is always a decision that must be made by the defendant, not the lawyer. The law on that issue was clearly explained to [Rios] by the trial judge before the defense rested. In this case, the question of whether [Rios] made the decision that he would not testify is a question of fact, one to be determined by assessing the credibility of the witnesses. [Trial counsel] testified at the evidentiary hearing that he and [Rios] specifically discussed the matter and [Rios] made the decision

that he would not testify. [Rios] gave contrary testimony, claiming that he wanted to testify but his lawyer rested the case without calling him as a witness. This Court, having heard the testimony of both witnesses, finds [trial counsel] credible and finds [Rios] unbelievable on this issue. This Court finds that [trial counsel] and [Rios] discussed whether [Rios] would testify and that it was [Rios's] choice not to testify.

(Internal citations omitted.)

█ We agree with the motion court's findings. Rios was clearly advised by the trial court that the decision whether to testify was solely his to make. Trial counsel confirmed that he discussed the subject of testifying with Rios, sought and evaluated impressions drawn from others about Rios's testimony in the first trial, advised Rios that he should not testify, and that the decision was made by Rios not to testify. Though Rios testified to the contrary, the motion court resolved the conflicting testimony in favor of trial counsel. "Determinations concerning credibility are exclusively for the motion court. The motion court is free to believe or disbelieve any evidence, whether contradicted or undisputed, and we defer to the credibility determinations of the motion court." *Stacker v. State,* 357 S.W.3d 300, 303 (Mo. App. S.D.2012). *See also Slater v. State,* 147 S.W.3d 97 (Mo.App. W.D.2004) (deference afforded to motion court's credibility findings where there was conflicting testimony regarding whether movant was advised that it was his decision to testify); *State v. Silas,* 885 S.W.2d 716 (Mo.App. W.D.1994) (deference afforded to motion court's credibility findings where there was conflicting testimony regarding whether movant desired to testify at trial).

Rios claims that the motion court's finding that Rios was not credible is clearly erroneous. Rios claims that even had he agreed that he would not testify, he should have been given one last opportunity to revisit the subject prior to his trial counsel's pronouncement that the defense rests. We reject Rios's argument, as it is not supported by authority. " 'Rule 84.04(d) requires that an Appellant provide appropriate citation to authority in support of his contentions. If no authority exists on the issue, an explanation for the absence of authority is required. If no explanation is given, we may consider the point to be abandoned.' " *Roberts,* 356 S.W.3d at 205.

The motion court's rejection of Rios's testimony as not credible requires the conclusion that Rios has not established deficient performance by his trial counsel. Moreover, Rios offers no support for his general claim of prejudice. Rios merely states that he "was denied effective assistance to his prejudice." While Rios claims that he would have testified at the second trial the same way he testified at his first trial, Rios fails to account for the fact that his testimony in the first trial resulted in a first degree murder conviction. Rios offers no plausible explanation for the argument that had he testified in the second trial (where he was convicted of the lesser charge of second degree murder) there is a reasonable probability that the result would have been different. Rios did testify at his post-conviction hearing that at the second trial, he also would have testified that he was not taught the Restraint at the Academy or anywhere else; that the first time he saw the Restraint was when Burke demonstrated it at his first trial; that on the morning of Valencia's death he left the police department at 5:00 a.m. and went directly home; that he never went to Valencia's apartment in the daylight hours; that the suicide attempts were due to his depression over his treatment in the media; and that he told Chief Deputy Monti-

celli to continue to work the case because he wanted the other officers to know he was innocent and he wanted the person responsible to be found. However, there is no analysis in Rios's brief about how testimony on these topics would have created a reasonable probability that the result of the second trial would have been different. "This court cannot make that argument for [Rios] because appellate courts do not function as an advocate for any party to an appeal." *State v. Simmons,* 364 S.W.3d 741, 749 (Mo.App. S.D. 2012).

The motion court's findings are not clearly erroneous. Point five is denied.

## Conclusion

We affirm the motion court's judgment.

All concur.